**Richmond**

ENVIRONMENTAL DEFENSE FUND, INC., JUAN RAMIREZ,

BENJAMIN H. RICE, M.D., and JOSEPH W. LAWLER

v.

VIRGINIA STATE WATER CONTROL BOARD, CHESAPEAKE

CORPORATION, UNION CAMP CORPORATION and

WESTVACO CORPORATION

No. 1594-91-2

Decided October 20, 1992

272

COUNSEL

David S. Bailey, for appellants.

John R. Butcher, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellees.

OPINION

**BRAY, J.**—Environmental Defense Fund, Inc., Juan Ramirez, Benjamin H. Rice, M.D., and Joseph W. Lawler (collectively "EDF") appeal an order of the circuit court denying their "Petition for Appeal" of the "Water Quality Standard" (standard) for 2, 3, 7, 8-tetrachlorodibenzo-p-dioxin (dioxin) established by the State Water Control Board (Board). Chesapeake Corporation, Union Camp Corporation and Westvaco Corporation (industry) were granted leave by the

trial court to intervene in the proceedings. In adopting the standard, EDF contends the Board "arbitrarily" responded only to economic and technological factors and, thus, violated its "statutory duty" to fix a standard which considered and "protected reasonable public stream uses."

We find no reversible error and affirm the judgment of the trial court.

## I. THE RECORD

Code § 62.1-44.2 expresses "the policy of the Commonwealth of Virginia" and the "purpose" of the State Water Control Law[1] to:

> (1) protect existing high quality state waters and restore all other state waters to such condition of quality that any such waters will permit all reasonable public uses and will support the propagation and growth of all aquatic life, including game fish, which might reasonably be expected to inhabit them, (2) safeguard the clean waters of the Commonwealth from pollution, (3) prevent any increase in pollution, (4) reduce existing pollution, and (5) promote water resource conservation, management and distribution, and encourage water consumption reduction in order to provide for the health, safety, and welfare of the present and future citizens of the Commonwealth.[2]

In furtherance of this policy, it is the "duty" of the Board and it "shall have the authority":

> (3a) To establish . . . standards of quality . . . for any state waters consistent with the general policy set forth in this chapter . . . and to take all appropriate steps to prevent quality alteration contrary to the public interest . . . . Whenever the Board considers the adoption . . . of any standard, it shall give due consideration to, among other factors, the economic and social costs and benefits which can reasonably be expected to obtain as a consequence of the standards . . . .

Code § 62.1-44.15.

---

[1] "Short title;" see Code § 62.1-44.2.
[2] This charge comports with Va. Const. art. XI, § 1.

Such action of the Board is governed procedurally by Code §§ 9-6.14:7.1 and 9-6.14:8 of the Administrative Process Act (Act). *See* Code § 62.1-44.15(3b).

On December 11, 1989, the Board directed its staff to "move to a public hearing" on a "proposed water standard for dioxin" of 1.2 parts per quadrillion (1.2). This action was followed by administrative proceedings and related "public hearings" in accordance with Code § 9-6.14:7.1. The proposal generated much comment from the Environmental Protection Agency (EPA), the Virginia Department of Health (VDH), EDF, industry and others, and the resulting record is voluminous and complex. As a consequence, this opinion recites only those facts necessary to a resolution of the case.

The record discloses that dioxin is an "unavoidable contaminant" produced during certain manufacturing processes. A carcinogen, lethal and injurious to life even in small doses, it was described as "one of the most toxic substances with respect to human health that has been found in the environment known to mankind." Unfortunately, it is presently discharged into the public waters of this Commonwealth, primarily as an "unintended by-product" of paper manufacturing by industry. If not regulated, this activity could expose "the population to additional cancer risks that would be unacceptable . . . [to] the State Department of Health."

However, determination of a dioxin exposure level that is tolerable by humans has proven "very difficult." Research with animals has revealed a "marked variation in host sensitivity and susceptibility," with experiments producing results that are sometimes "contradictory." "[D]efinition" of an "acceptable risk level for the general population" was described by the State Health Commissioner as an "enigma" which required a "policy decision" that assured "minimal or insignificant" exposure.

In an effort "to translate choices among dioxin factors into a final standard," the EPA developed a "modeling formula" designed to consider properly these numerous "factors" by numerical weighting.

This equation was "accepted by all parties as the best means of predicting an appropriate . . . standard," utilized by the Board in this instance, and is as follows:

$$\text{DIOXIN WATER QUALITY STANDARD} = \frac{\text{RISK LEVEL X BODY WEIGHT}}{\text{CANCER POTENCY X INTAKE (WATER + FISH CONSUMPTION X BIOCONCENTRATION FACTOR)}}$$

Manifestly, a variation in any component of the formula would alter the result, and the evidence disclosed particular uncertainty and disagreement surrounded the numerically correct "CANCER POTENCY," "RISK LEVEL" and "BIOCONCENTRATION" factors.[3]

At its meeting on March 19, 1990, Board staff, EDF and industry representatives addressed the Board on the proposed standard. Following the several presentations, the Board deferred "action" until its May meeting and, on May 14, 1990, approved, without dissent, the originally proposed 1.2 standard. The evidence indicates that this standard would "reduce existing pollution" associated with dioxin discharge. *See* Code § 62.1-44.2(4).

In selecting the standard, the Board adhered to RISK LEVEL and BIOCONCENTRATION numbers that were within the EPA approved range and applied a CANCER POTENCY estimate described by the federal agency as "within the range of scientific defensibility" and "acceptable." Reduced standards recommended by the VDH, 0.056 parts per quadrillion, and by the EPA, 0.13 parts per quadrillion, resulted from application of more conservative equation components, all of which were also compatible with the EPA scale. Industry supported the 1.2 standard as both scientifically sound and technologically and economically achievable, while EDF regarded the EPA proposal as "the only criteria [sic] that is protective for Virginia waters."

Dissatisfied with the Board's decision, EDF pursued judicial "review" of its action by a "PETITION FOR APPEAL" (petition) filed in the trial court pursuant to the provisions of Code § 9-6.14:16(A).

---

[3] Cancer potency "refers to the degree to which dioxin causes a response in tissue." Risk level relates to the "number of additional lifetime cancer risk cases per given population," i.e. one per one million people. Bioconcentration reflects "the measure of a chemical's tendency to concentrate in the tissues of organisms," primarily aquatic life in this instance.

*See* Code §§ 62.1-44.29, 62.1-44.30, 9-6.14:17. Through several "issues on appeal," EDF argued that the decision resulted from the Board's consideration of only "that standard which was economically and technologically feasible and could be measured by current analytical methods." The result, EDF complained, neither considered nor protected "stream uses, including fish and aquatic life as well as public health" and, as a consequence, violated both "federal and state law."[4] EDF, therefore, urged the trial court to conclude that the Board had "arbitrarily and unreasonably" failed to protect "public health" and "aquatic life" from the "toxic effects of dioxin" and violated "its purpose" and the "intent and policies of the Water Control Law."

The record discloses that the court properly reviewed "this matter on the basis of the agency file, supplemented" by memoranda and argument of counsel. In his initial letter opinion, the trial judge identified the Board's failure "to adopt a dioxin standard which would achieve the purposes of the State Water Control Law" expressed in Code § 62.1-44.2 as the "root" of the EDF challenge. He recognized that the "basic premise" to this contention was the Board's predisposition to a standard that considered only "economic," "social" and "technical" factors, "to the exclusion of stream uses" and other considerations mandated by statute. *See* Code §§ 62.1-44.2, 62.1-44.15(3a).

In reviewing the Board's action, the trial court considered the entire record, including the scientific and other evidence, as it related to the selected standard. The judge noted that "the determination of the figures to use in each of the factors" was a decision "derived from blends of policy choices . . . and . . . data" beyond the "competence of the courts," and demanding the "special expertise" of the administrative agency. Thus, the trial court found that the Board's standard was entitled to a "high degree of deference," was "supported by substantial evidence," and was "within the scope of [its] legal authority."

---

4 EPA approved the 1.2 standard in accordance with the federal Clean Water Act, 33 U.S.C. § 1251.

## II. STANDARD OF REVIEW

■ The parameters of judicial review of "agency action" are defined in Code § 9-6.14:17 of the Act.[5] This Court has previously instructed that the "issues of law" specified in the statute "fall into two categories: first, whether the agency . . . acted within the scope of [its] authority, and second, whether the decision itself was supported by the evidence." *Johnston-Willis Ltd. v. Kenley*, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). Although many circumstances involve "mixed questions" of both "law and fact," issues are sometimes "oversimplified" as "legal" or "factual," a distinction which is significant to judicial review of an administrative decision. *See id.* at 243, 369 S.E.2d at 7.

■ It is well established that agency action is presumed valid on review, and the burden rests "upon the party complaining" to overcome this presumption. Code § 9-6.14:17; *Commonwealth ex rel. State Water Control Bd. v. Appalachian Power Co.*, 9 Va. App. 254, 259, 386 S.E.2d 633, 635 (1989), *aff'd en banc*, 12 Va. App. 73, 402 S.E.2d 703 (1991). However, agency resolution of "factual issues" is generally "accorded greater deference" than decisions related to "legal issues." *Johnston-Willis*, 6 Va. App. at 242-43, 369 S.E.2d at 7.

■ In "the context of factual issues," Code § 9-6.14:17 mandates that "the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." *Id.* at 242, 369 S.E.2d at 7. This heightened deference acknowledges an agency's "expert discretion [in] matters coming within its cognizance and [allows] judicial interference . . . only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion." *Virginia Alcoholic Beverage Control Comm'n v. York Street Inn, Inc.*, 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979) (quoting *Schmidt v. Board of Adjustment of Newark*, 9 N.J. 405, 423, 88 A.2d 607, 615-16 (1952)). A "reviewing court may reject [an] agency's findings of fact only if, considering the record as a whole, a

---

[5] "[I]ssues of law" subject to review by the court include: "(i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidential support for findings of fact. Code § 9-6.14:17.

reasonable mind would necessarily come to a different conclusion." *Johnston-Willis*, 6 Va. App. at 242, 369 S.E.2d at 7; *see* Code § 9-6.14:17.

 In contrast, judicial review of a "legal issue" requires "little deference," unless it also "falls within an agency's area of particular expertise." *Johnston-Willis*, 6 Va. App. at 243-46, 369 S.E.2d at 8. This principle recognizes the "special competence" of the judiciary to decide issues of "common law," "constitutional law" or "statutory interpretation," distinct from "findings of fact." *Id.* Courts must "construe and determine compliance with the statutes governing adoption of administrative regulation irrespective of the agency's construction," *Appalachian Power*, 9 Va. App. at 259-60, 386 S.E.2d at 636, and not "merely rubber-stamp an agency determination," *Johnston-Willis*, 6 Va. App. at 243, 369 S.E.2d at 8. Agency action, even when "supported by substantial evidence," must be set aside if judicial review reveals a failure "to observe the required procedures or to comply with statutory authority." *Id.* at 243, 369 S.E.2d at 7; *see State Bd. of Health v. Godfrey*, 223 Va. 423, 434, 290 S.E.2d 875, 880-81 (1982); *Muse v. Virginia Alcoholic Beverage Control Bd.*, 9 Va. App. 74, 78, 384 S.E.2d 110, 112 (1989); Code § 9-6.14:17.

## III. ANALYSIS

EDF's challenge in the instant case advances a legal issue, the Board's failure to comply with its statutory mandate. In our review and analysis, EDF directs us more to the Board's decision-making process than to the evidence. EDF argues that the Board was predisposed to a standard fashioned only by economic, technical and social considerations and unwilling to consider properly and protect all "reasonable public stream uses." This approach is condemned by EDF as inconsistent with the policy of the Commonwealth expressed in Code § 62.1-44.2 and the mandate of Code § 62.1-44.15(3a) and thus in violation of the Board's statutory duty. In support of this contention, EDF relies upon staff remarks, discussion and debate within the Board, and the recommendations and comments of industry, VDH and the EPA. EDF also maintains that a history of VDH "health advisories," prompted by the dioxin contamination of certain waterways in the Commonwealth, further discredited the Board's conduct and its 1.2 standard.[6]

---

[6] VDH has apparently not adopted a dioxin "standard," and the record does not disclose the effect, if any, of the Board's standard on future VDH "health advisories." Had the VDH

■ This argument, however, presents a mixture of legal and factual questions, each indispensable to a correct analysis of the substantive legal issue and, as expressed in *Johnston-Willis*, illustrates the difficulty with the legal/factual dichotomy. 6 Va. App. at 243, 369 S.E.2d at 7-8. Proper judicial review of the Board's action must not be restricted to legal issues, but must encompass "all . . . proofs" found within the entire record. Code § 9-6.14:17. Interrelated factual and legal issues must be considered together in the context of the entire record, with each examined under the appropriate standard of review. The court may then discharge its statutory duty and "determine . . . whether the result reached . . . could reasonably be said, . . . to be within the scope of the legal authority of the agency." *Id.*

Therefore, according due deference to the Board's factual findings, the record reveals substantial credible evidence to support the 1.2 dioxin water quality standard. The decision followed extended debate, addressed and resolved conflict and uncertainty in the evidence and balanced numerous interests. All views were presented to the Board, and the relevant statutory factors were fully explored and developed for its consideration. *See* Code § 62.1-44.15(3a). On appeal, we cannot seize upon questions, comments or incidences of an orderly administrative process to discredit agency action that is supported by the record, viewed in context and as a whole. *See Yarborough v. Commonwealth*, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977).

When the Board's action is scrutinized in relation to its duties and responsibilities, the decision was not only factually sound but faithful to statute. The Board selected a standard that was "based on the proper application of its expert discretion" to appropriate evidence and statutory considerations, in harmony with "the purposes of the basic law" and neither "arbitrary" nor "capricious." *Johnston-Willis*, 6 Va. App. at 246, 369 S.E.2d at 9; Code § 62.1-44.15(3a). Therefore, again based on the entire record, including "all . . . proofs," it can "reasonably be said" that the Board acted within its "legal authority" and without error. Code § 9-6.14:17.

---

itself promulgated "public health standards" with respect to dioxin, the statute would have specifically required the Board give "due consideration" to this action and provide written and published "reason for any deviation." Code § 62.1-44.15(3a).

Accordingly, we hold that the Board acted within its statutory authority and affirm the trial court's decision.

*Affirmed.*

Baker, J., and Coleman, J., concurred.