COURT OF APPEALS OF VIRGINIA


Present: Judges Bray, Clements and Senior Judge Hodges
Argued at Chesapeake, Virginia


SUZANNE H. SCHEER,
 JULIAN W. SCHEER, MR. AND MRS.
 STEVEN RODGERS, BARBARA KRAMER
 SILBERSIEPE, HALLIDAY AND WILLIAM
 WOODBURY, MICHAEL AND MARGRETA
 STEVENS, FERA AND ARMAND SIMONE AND
 DEAN N. McDOWELL
                                     MEMORANDUM OPINION[*] BY
v.   Record No. 0095-00-4             JUDGE RICHARD S. BRAY
                                          JULY 17, 2001
COMMONWEALTH OF VIRGINIA, ex rel.
 STATE WATER CONTROL BOARD AND
 COUNTY OF FAUQUIER


          FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                   Thomas D. Horne, Judge

          Gail Starling Marshall for appellants.

          Deborah Love Feild, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee Commonwealth of Virginia, ex rel.
          State Water Control Board.

          Kevin J. Burke, Deputy County Attorney (Paul S.
          McCulla, County Attorney, on brief), for appellee
          County of Fauquier.


     Suzanne H. Scheer, et al., (appellants) appeal an order of

the trial court affirming the issuance by the State Water Control

Board (SWCB) of a Virginia Water Protection Permit (VWPP) to

Fauquier County, Virginia (Fauquier). Citing numerous perceived

---

     [*] Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

deficiencies in the permit and underlying record, appellants contend the SWCB "exceeded its statutory authority and violated the statutory mandates for such a permit." Finding no error, we affirm the trial court.

The parties are fully conversant with the voluminous and complex record, and this memorandum opinion recites only those facts necessary to a disposition of the appeal. In accordance with well established principles, we review the evidence in the light most favorable to the prevailing party below, Fauquier in this instance.

                                    I.

Pursuant to Code § 62.1-44.15:5, Fauquier applied to SWCB for a VWPP to construct a concrete dam across Cedar Run, a local stream, together with attendant undertakings and facilities (the project), to provide a water supply to Fauquier and aid in flood control. Designated "Cedar Run 6[,] Auburn Reservoir (Dam)," the resulting lake would embrace a surface area of approximately 183 acres, inundate 16 acres of existing wetlands and 11,000 feet of "stream channel," and otherwise impact Cedar Run and related habitat and adjacent properties. Because the project involved the "discharge of dredge or fill material" into Cedar Run, § 404 of the Federal Clean Water Act, 33 U.S.C. § 1341, (federal act), required a permit from the United States Corps of Engineers (the Corps). Section 401 of the federal act precludes issuance of such permit absent either "a certification from the State in which the

-

discharge originates or will originate" that the proposed activity will comply with the federal act, or a waiver of such certification.  33 U.S.C. § 1341(a)(1).

A VWPP issued in accordance with Code § 62.1-44.15:5(A) "shall constitute the certification required under § 401 of the [federal act]," Code § 62.1-44.15:5(A).  The SWCB is required to issue such permit once "it has determined that the proposed activity is consistent with the provisions of the [federal act] and the State Water Control Law and will protect instream beneficial uses."  Code § 62.1-44.15:5(B).  "The preservation of instream flows for purposes of . . . the protection of fish and wildlife resources and habitat [and] recreation . . . is a beneficial use of Virginia's waters. . . .  Domestic and other existing beneficial uses[1] shall be considered the highest priority uses."  Code § 62.1-44.15:5(C).  In resolving the issues incident to a VWPP, the SWCB may impose conditions on the permit, including, "but . . . not limited to, the volume of water which may be withdrawn as a part of the permitted activity" and "compensating mitigation for adverse impacts to wetlands." Code§ 62.1-44.15:5(C), (E).

---

[1] "'Beneficial use'" is defined by Code § 62.1-10 to "mean[] both instream and offstream uses.  Instream beneficial uses include, but are not limited to, the protection of fish and wildlife habitat, . . . recreation . . . and cultural and aesthetic values.  Offstream beneficial uses include, but are not limited to, domestic (including public water supply) . . . uses.  Public water supply uses for human consumption shall be considered the highest priority."

-

Acting on Fauquier's application, the SWCB solicited both public and governmental comment, conducted hearings and received considerable documentary evidence.  Accordingly, the resulting permit was subject to numerous conditions addressing a myriad of issues related to the project.  Aggrieved by the SWCB decision, appellants unsuccessfully sought "judicial relief" in the trial court pursuant to Code § 62.1-44.29, a procedure governed by the provisions of Code § 9-6.14:1 et seq., the Administrative Process Act (APA).  Unsuccessful, appellants now appeal to this Court. See Code § 62.1-44.30.

II.

Code § 9-6.14:17 establishes "[t]he parameters of judicial review of 'agency action.'"  Envtl. Def. Fund, Inc. v. Va. State Water Control Bd., 15 Va. App. 271, 277, 422 S.E.2d 608, 611 (1992).  At the outset, the statute requires "the party complaining of agency action to designate and demonstrate an error of law subject to review by the court."  Code § 9-6.14:17.  "Such issues of law," specifically enumerated by Code § 9-6.14:17, "'fall into two categories: first, whether the agency . . . acted within the scope of [its] authority, and second, whether the decision itself was supported by the evidence.'"[2]  Id. (citing

---

[2] "[I]ssues of law" subject to review by the court include:

(i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as

-

<u>Johnson-Willis, Ltd. v. Kenley</u>, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988)).

> Where the agency has the statutory
> authorization to make the kind of decision
> it did and it did so within the statutory
> limits of its discretion and with the intent
> of the statute in mind, it has not committed
> an error of law in the first category.  The
> second category of error is limited to a
> determination whether there is substantial
> evidence in the agency record to support the
> decision.

<u>Johnson-Willis</u>, 6 Va. App. at 242, 369 S.E.2d at 7.

"'The phrase "substantial evidence" refers to such relevant evidence as a reasonable mind <u>might</u> accept as adequate to support a conclusion.  Under this standard, . . . the court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would <u>necessarily</u> come to a different conclusion."  <u>Aegis Waste Solutions, Inc. v. Concerned Taxpayers of Brunswick Co.</u>, 261 Va. 395, 404, 544 S.E.2d 660, 665 (2001) (citation omitted).  "In contrast, judicial review of a 'legal issue' requires 'little deference[,]' <u>unless</u> it . . . 'falls within an agency's area of particular expertise.'"

---

> provided in the basic laws as to subject
> matter, the stated objectives for which
> regulations may be made, and the factual
> showing respecting violations or entitlement
> in connection with case decisions, (iii)
> observance of required procedure where any
> failure therein is not mere harmless error,
> and (iv) the substantiality of the
> evidential support for findings of fact.

Code § 9-6.14:17.

-

<u>Envtl. Def. Fund</u>, 15 Va. App. at 278, 422 S.E.2d at 612

(citation omitted) (emphasis added).

Thus, "agency action, even when 'supported by substantial evidence,' must be set aside if judicial review reveals a failure 'to observe the required procedures or to comply with statutory authority.'"  <u>Id.</u> (citation omitted).

> However, where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts[,] . . . "and judicial interference is permissible only for relief against . . . arbitrary or capricious action that constitutes a clear abuse of the delegated discretion."

<u>Johnson-Willis</u>, 6 Va. App. at 244, 369 S.E.2d at 8 (citation omitted).

Appellants' several assignments of error clearly advance legal issues.  However, such issues implicate both legal and factual questions and "mixed question[s] of fact and law [are] reviewable by this Court on appeal."  <u>The Country Vintner, Inc. v. Rosemont Estates</u>, 35 Va. App. 56, 63, 542 S.E.2d 797, 800 (2001).  Thus, guided by Code § 9-6.14:17, we consider the "[i]nterrelated factual and legal issues . . . together in the context of the entire record," examining each "under the appropriate standard of review" and with due deference, to determine "'whether the result reached . . . could reasonably be said, . . . to be within the scope of the legal authority of the

-

agency.'" Envtl. Def. Fund, 15 Va. App. at 279, 422 S.E.2d at 612. Viewed accordingly, we address appellants' several arguments seriatim.

### III.

Appellants first assert that the VWPP in dispute fails to protect "instream beneficial uses," accord "highest priority" to existing beneficial uses, and comport with the federal act, as mandated by Code § 62.1-44.15:5(B). In support of such contentions, appellants rely upon a "submission" by the Virginia Department of Game and Inland Fisheries (DGIF) concluding that "loss of stream habitat," resulting from inundation and reduced stream "flows and increased water temperature,"[3] "probably will adversely impact" certain "sportfish species," specifically including the propagation of smallmouth bass, and recreational "stream fishing" opportunities. Further, appellants maintain that "low flows authorized by the [VWPP]" do not "protect . . . [winter and early spring] recreational . . . canoeing" on Cedar Run. In a related argument, appellants reason that loss of smallmouth bass breeding habitat, an existing beneficial instream use, impermissibly compromises the water quality of Cedar Run.

---

[3] DGIF speculated that periodic "cold water releases" intended to remediate temperature increases "may result in substantial changes in the existing warmwater aquatic community."

-

Appellants' challenges are predicated on the notion that a VWPP in conformity with the mandates of Code § 62.1-44.15:5 must "do no harm" to "beneficial stream uses." However, appellants' argument ignores the manifest purpose of the permitting process and attendant responsibility and authority of the SWCB pursuant to the State Water Control Law,[4] Code § 62.1-44.2, et seq. The certification mechanism of Code § 62.1-44.15:5 contemplates alteration and disruption of beneficial stream uses resulting from the "discharges of dredge or fill material," through the issuance of permits for such activity in conjunction with § 404 of the federal act. However, in acting on a VWPP application, the SWCB is directed to protect such uses through denial of a permit, if necessary, or the imposition of appropriate conditions. Thus, to construe the permit standard as a precluding any "harm" would obviate the statutory purpose, an absurd result. Branch v. Commonwealth, 14 Va. App. 836, 839, 419 S.E.2d 422, 424 (1992) ("The plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction, a statute should never be construed so that it leads to absurd results.").

---

[4] State Water Control Law is intended, in pertinent part, "to: (1) protect existing high quality state waters . . . promote water resource conservation, management and distribution . . . in order to provide for the health, safety and welfare of the present and future citizens of the Commonwealth." Code § 62.1-44.2.

-

Here, the record discloses that Cedar Run presently suffers from "many days when the flow is zero," a "very damaging condition for aquatic life." "SPECIAL CONDITIONS" of the VWPP establish a "threshold flow" to assure "that the project will not cause [a "streamflow level"] to occur more often than it would have occurred without the project" and a "floor flow" to maintain a "streamflow level" "at all times." Threshold flows imposed by the SWCB following the original "submission" by DGIF, comported with DGIF recommendations. "[C]ontrol outlet structures . . .[,] capable of releasing the required minimum instream flows into Cedar Run," insure the maintenance of required flow rates, and mandatory reporting to the SWCB monitors compliance. Violations must be disclosed to SWCB "within one week following discovery."

The Department of Environmental Quality (DEQ), in commenting on issues pertaining to the VWPP, noted that stratification of lake water oftentimes produces "warmer, less dense oxygenated water floating on top of colder, dense, deoxygenated water," with seasonal variations, and uncontrolled releases could degrade "downstream" water. Accordingly, the permit mandates "[w]ater quality standards for dissolved oxygen and temperature shall not be violated by the [project]." An "intake tower . . . [with] multiple intake ports" draws from different lake levels to "control temperature" and reoxygenation

-

occurs "[a]s water falls . . . to the bottom of the spillway."
Monitoring devices are required to demonstrate compliance,
together with specified reporting requirements.

An "Environmental Assessment Report" (EA)[5] prepared by the
USDA Soil Conservation Service in response to the instant VWPP
application concluded that "[f]isheries resources upstream of
the pool area will not be affected" by the project and "will be
improved in the pool and downstream," with minimum flow levels
"to insure the integrity of the downstream . . . resource," and
no increase in water temperature, resulting in "a significant
downstream water quality benefit."  While the project will "have
an adverse impact on . . . terrestrial species . . . within the
pool area[,] it will provide aquatic animals an expanded
habitat."

Presently, increased water flow in Cedar Run during winter
and spring permits canoeing in areas below the dam.  The "white
water" enhancement of such activity is dependent upon variable
stream conditions and, clearly, canoeing is impossible during
periods of little or no creek flow.  The evidence before the
SWCB suggests that creek flows would remain seasonally cyclical,
subject to controls to avoid either the extremes of flood or

---

[5] Appellants' contention that the EA, which supplements an
Environmental Impact Statement (EIS), not in evidence, prepared
in 1975 in response to a very different proposal, is unreliable
raises an issue of weight, not admissibility.  We find the SWCB
properly admitted the EA into evidence and considered related
findings, conclusions and recommendations.

-

drought, conditions inconsistent with recreational use.  The record does not support appellants' contention that post-project stream flows would eliminate canoeing.

Thus, the record, including documentary proofs and other evidence, clearly reflects a VWPP which protects existing instream uses, properly issued upon consideration of facts and circumstances before the SWCB.  Although characteristics of Cedar Run within the immediate project area are altered, downstream water quality, habitat, fisheries resources and recreational opportunities are either preserved or enhanced.[6] Under such circumstances, the SWCB properly exercised statutory authority in issuance of the VWPP.

Next, appellants assert the instant VWPP improperly permits mitigation for wetlands destroyed by the project to occur in another watershed, thereby failing to "offset harm to water quality" within the impacted Cedar Run watershed and, further, approves a "[m]itigation concept," conditioned upon later submission of the requisite "final . . . plan for DEQ approval" in violation of 9 VAC 25-210-80(A)(2)(K).

In response to a "[m]itigation concept" submitted to the SWCB by Fauquier, a "SPECIAL CONDITION" of the VWPP requires

---

[6] Because existing instream beneficial uses were not improperly compromised by the VWPP, we decline to address appellants' subsidiary argument that the trial court "sacrificed" such uses to "accommodate . . . proposed offstream uses."

-

Fauquier "to mitigate for cumulative loss of 16 acres of wetlands by enhancing, creating and preserving wetlands on the 100 acre plus wetland complex . . . owned by Fauquier" in another watershed.  Details of the required mitigation are specified in the permit and a "final plan," developed in cooperation with the Natural Resources Conservation Service and the Corps, must be submitted "to DEQ for review and approval within twenty-four months of [the VWPP] issuance" date.

Code § 62.1-44.15:5(E) provides

> [w]hen a [VWPP] is conditioned upon
> compensatory mitigation for adverse impacts
> to wetlands, the applicant may satisfy all
> or part of such mitigation requirements by
> the purchase or use of credits from any
> [specified] wetlands mitigation bank . . .
> as long as: (1) the bank is in the same
> . . . river watershed[] as the impacted site
> . . . .

9 VAC 25-210-90(C) requires a VWPP permittee "to provide mitigation of . . . adverse [wetland] impact on an in kind basis where impacts cannot be avoided."

Appellants advocate a construction of both the statute and rule inconsistent with the clear meaning of each.  Code § 62.1-44.15:5(E) expressly mandates wetland mitigation within the same watershed only when such mitigation is accomplished through "credits" purchased from a "mitigation bank," a circumstance not present on the instant record.  Nothing suggests legislative intent to impose a like requirement on all mitigation plans.  "Where a statute is unambiguous, the plain

-

meaning is to be accepted without resort to the rules of statutory interpretation." Last v. Va. State Bd. of Med., 14 Va. App. 906, 910, 421 S.E.2d 201, 205 (1992). Similarly, a plain reading of 9 VAC 25-210-90(C) does not reflect an intent to confine mitigation to the watershed directly impacted by wetland loss, but, rather, simply that such wetlands be replaced "in kind," or by "similar" wetlands, without specifying location. See Black's Law Dictionary 1383 (6th ed. 1990).

Water quality issues indirectly related to wetlands destruction resulting from the project are subsumed in the mitigation considerations, while impacts immediately attendant to the activity are otherwise addressed by the SWCB review process. Here, the EA indicated "[t]he plan will have significant downstream water quality benefit," reducing sediment, turbidity and pollution, maintaining the existing "III-B" DEQ classification of "stream quality" and "complimentary to the on-going programs to improve the bay."

With respect to appellants' challenge to the sufficiency of the application, the adequacy of the "mitigation concept" initially submitted to SWCB was an issue governed by applicable regulations, to be determined in the exercise of the Board's sound discretion. See Va. Real Estate Bd. v. Clay, 9 Va. App. 152, 159, 384 S.E.2d 622, 626 (1989) ("[T]he interpretation which an administrative agency gives its regulation must be accorded great deference and will not be set aside unless

-

arbitrary and capricious.").  Thus, again, appellants have not demonstrated an error of law by the SWCB.

Lastly, appellants urge us to "vacate[]" the VWPP because the SWCB "failed to include enforcement mechanisms for . . . conditions" specified in the permit.  However, review of the permit discloses numerous monitoring, reporting and notification directives included as "SPECIAL CONDITIONS."  The SWCB is not required to specify monitoring procedures which VWPP applicants must adopt to warrant compliance with permit conditions.  The SWCB is empowered to inspect and investigate "as . . . necessary to carry out the provisions" of State Water Control Law, Code § 62.1-44.13, and pursue both civil and criminal penalties for violations, including noncompliance with VWPP certifications.  See Code § 62.1-44.20 et seq.  Thus, ample safeguards assure performance of conditions imposed on the instant permit, and otherwise by law, with respect to construction and operation of the project.

Accordingly, for the reasons stated, we affirm the trial court.

Affirmed.

-