COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judge Humphreys and Senior Judge Clements
Argued at Richmond, Virginia


APPALACHIAN VOICES,
   CHESAPEAKE CLIMATE ACTION NETWORK,
   SIERRA CLUB AND SOUTHERN APPALACHIAN
   MOUNTAIN STEWARDS
                                                    OPINION BY
v.        Record No. 2199-09-2            JUDGE JEAN HARRISON CLEMENTS
                                                    MAY 25, 2010
STATE AIR POLLUTION CONTROL BOARD AND
   VIRGINIA ELECTRIC AND POWER COMPANY


                FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Margaret P. Spencer, Judge

            Caleb A. Jaffe (John T. Suttles; Southern Environmental Law Center,
            on briefs), for appellants.

            Kerri L. Nicholas, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General; Roger L. Chaffe, Senior Assistant
            Attorney General, on brief), for appellee State Air Pollution Control
            Board.

            Timothy G. Hayes (Kevin J. Finto; Miranda R. Yost; Andrea W.
            Wortzel; Hunton & Williams LLP, on brief), for appellee Virginia
            Electric and Power Company.


        Appalachian Voices, Chesapeake Climate Action Network, Sierra Club, and Southern

Appalachian Mountain Stewards (collectively "the Coalition") appeal a decision of the circuit court

affirming a decision of the State Air Pollution Control Board (the Board) to issue a permit pursuant

to the Prevention of Significant Deterioration Program (PSD permit) to Virginia Electric and Power

Company (Dominion) to build and operate a coal-fired electric generating plant in Wise County,

Virginia.  On appeal, the Coalition contends the circuit court erred by:  (1) concluding that carbon

dioxide ($CO_2$) is not a pollutant "subject to regulation" by the Board and under the federal Clean Air

Act (CAA); and (2) approving the Board's use of the more coarse particulate matter pollutant, $PM_{10}$, as a surrogate for the regulation and control of the more fine particulate matter pollutant, $PM_{2.5}$, without demonstrating that it was reasonable to do so. We affirm the decision of the circuit court.

BACKGROUND

In accordance with familiar principles of appellate review, "we review the facts in the light most favorable to sustaining the Board's action." Crutchfield v. State Water Control Bd., 45 Va. App. 546, 553-54, 612 S.E.2d 249, 253 (2005) (citing Atkinson v. Virginia Alcohol Beverage Control Comm'n, 1 Va. App. 172, 176, 336 S.E.2d 527, 530 (1985)).

The CAA, 42 U.S.C. § 7401 *et seq.*, requires applicants seeking to construct major sources of air pollution in attainment areas, such as Dominion's proposed coal-fired facility, to undergo New Source Review (NSR) and obtain a PSD permit prior to construction. 42 U.S.C. § 7475. The PSD permit includes limitations or conditions to ensure that emissions from the permitted facility: (1) will not cause or contribute to violations of the National Ambient Air Quality Standards (NAAQS) established by the CAA; and (2) will be controlled sufficiently to maintain existing air quality in the surrounding region. Although the PSD program is federal law, the Department of Environmental Quality (DEQ) and the Board have authority to issue PSD permits because Virginia has an EPA approved "State Implementation Plan" (SIP), giving the Commonwealth primary responsibility to administer the PSD program. See Code § 10.1-1322 *et seq.*

As part of the permitting process, DEQ must conduct an air quality analysis and control technology review. PSD permits also contain emissions limits for certain pollutants that represent those obtainable by the use of best available control technology (BACT) as determined for the source. 42 U.S.C. § 7475(a)(4). BACT means, in pertinent part: "[a]n emissions limitation . . . based on the maximum degree of reduction for each *regulated NSR pollutant* that would be emitted from any proposed major stationary source . . . ." 9 VAC 5-80-1615 (emphasis added).

In July 2006, Dominion filed its application for the PSD permit to build and operate a coal-fired electric generating facility, the Virginia City Hybrid Energy Center (VCHEC), in order to meet current and projected electricity demand. DEQ published the first draft of the permit in January 2008 with supporting engineering analysis. Prior to the issuance of the final permit, Dominion also undertook studies, modeling, analysis and technology, review. During the public comment period, the Coalition raised several concerns about the draft permit. On June 25, 2008, the Board approved the PSD permit, which was issued on June 30, 2008.

The Coalition filed a petition for appeal in the circuit court in August 2008, raising several challenges to the Board's approval of the PSD permit. The Coalition argued that the PSD permit should have included emission limits for $CO_2$ and the Board erred by failing to require BACT analysis for $CO_2$. DEQ and Dominion responded that neither state nor federal law requires regulation of $CO_2$ and, at the time of the permitting process, there was no guidance for the development of $CO_2$ emissions standards. The circuit court agreed with DEQ and Dominion, finding there was no legal requirement that the Board conduct a BACT analysis for $CO_2$ because $CO_2$ is not subject to regulation under either federal or state law.

The Coalition also argued to the circuit court that the Board improperly relied on guidance from the Environmental Protection Agency (EPA) relating to the use of $PM_{10}$ as a surrogate for $PM_{2.5}$.

EPA has established NAAQS for both $PM_{10}$ and $PM_{2.5}$. These are standards for particulate matter (soot) less than 10 micrometers in diameter, $PM_{10}$, and less than 2.5 micrometers in diameter, $PM_{2.5}$. The Coalition asserted to the circuit court that the $PM_{2.5}$ limit in the PSD permit was unlawful because the Board relied upon antiquated EPA guidance relating to the use of $PM_{10}$ as a surrogate for $PM_{2.5}$. The Coalition argued that the Board should have applied a BACT analysis to determine whether the surrogacy was appropriate in this particular case.

- 3 -

In response, DEQ and Dominion asserted that DEQ and the Board consistently followed EPA's recommended procedure and DEQ's own guidance for implementing the procedure for using $PM_{10}$ as a surrogate for $PM_{2.5}$. In addition, Dominion provided modeling that demonstrated compliance with the $PM_{2.5}$ NAAQS. Moreover, the Board included a provision in the PSD permit requiring review of the existing permit emission limit for $PM_{2.5}$ when the final $PM_{2.5}$ implementation guidance is promulgated by EPA. The PSD permit also requires $PM_{2.5}$ ambient air quality monitoring to begin upon commercial start up of the facility.

The circuit court ruled that there was substantial evidence in the record to support the Board's approach to controlling $PM_{2.5}$ emissions "for the reasons stated in the briefs and oral arguments" of the Board and Dominion.

By order entered on September 2, 2009, the circuit court affirmed the decision of the Board to issue the PSD permit. The Coalition appealed the circuit court's decision to this Court.

STANDARD OF REVIEW FOR CARBON DIOXIDE ISSUE

Judicial review of the Board's decision to issue the permit is governed by the Virginia Administrative Process Act. Code § 2.2-4000 *et seq.* The burden is on the Coalition to designate and demonstrate an error of law for the court to review. Code § 2.2-4027.

Questions of law are reviewed *de novo*. See Clark v. Marine Res. Comm'n, 55 Va. App. 328, 334-35, 685 S.E.2d 863, 866 (2009) (citing Moreau v. Fuller, 276 Va. 127, 133, 661 S.E.2d 841, 845 (2008)). "[J]udicial review of a 'legal issue' requires 'little deference,' unless it . . . 'falls within an agency's area of particular expertise.'" Envtl. Defense Fund, Inc. v. State Water Control Bd., 15 Va. App. 271, 278, 422 S.E.2d 608, 612 (1992) (quoting Johnston-Willis v. Kenley, 6 Va. App. 231, 243-46, 369 S.E.2d 1, 8 (1988)). "Whether the issue is one of law or fact or substantial evidence, we are directed to 'take account of the role for which agencies are created and public policy as evidenced by the basic laws under which they operate.'"

- 4 -

Johnston-Willis, 6 Va. App. at 244, 369 S.E.2d at 8 (citing Revisor's Note to former Code § 9-6.14:17). "Thus, the degree of deference afforded an agency decision depends upon not only the nature of the issue, legal or factual, but also upon whether the issue falls within the area of 'experience and specialized competence of the agency.'" Id. at 243, 369 S.E.2d at 8 (citing former Code § 9-6.14:17, recodified as Code § 2.2-4027).

"The basic law under which the Commissioner acts and the purposes of the law are crucial to the determination of a reviewing court." Id. (citing Virginia Alcoholic Beverage Control Comm'n v. York Street Inn, Inc., 220 Va. 310, 313, 257 S.E.2d 851, 853 (1979)). The General Assembly has authorized the Board and DEQ to grant and enforce permits for the construction and operation of major sources of air pollution within the Commonwealth "to protect all aspects of Virginia's environment." Code § 10.1-1183. See also Code § 10.1-1322. In addition, the General Assembly has authorized the Board to promulgate regulations abating, controlling, and prohibiting pollution throughout the Commonwealth. Code § 10.1-1308.

We conclude that the $CO_2$ question involves a question of law, however, we also take into account that the issue falls within the area of "experience and specialized competence" of the Board as the agency authorized by the General Assembly to issue PSD permits.

CARBON DIOXIDE ISSUE

The CAA requires permitting agencies to undertake a BACT analysis for each pollutant that "is subject to regulation" under the CAA. 42 U.S.C. § 7475(a). The term "subject to regulation" is not defined in the CAA. Since 1993, EPA has implemented only monitoring, reporting, and record keeping requirements concerning $CO_2$. See 40 C.F.R. § 75.1.

The Coalition concedes that there are no federal or state standards or emission limitations for $CO_2$. However, they contend that $CO_2$ is a pollutant "subject to regulation" under the CAA based on EPA's monitoring, reporting, and record keeping regulations for $CO_2$. Thus, the

Coalition asserts that the PSD permit should have included emission limits for $CO_2$. The Coalition also argues the Board erred by not completing a BACT analysis to establish enforceable emission limits for $CO_2$ in the PSD permit. In addition, the Coalition asserts the Board subjected $CO_2$ to regulation for this facility by establishing $CO_2$ offset provisions in the permit.

DEQ, in concluding that $CO_2$ is not "subject to regulation," explained:

> Currently, there are no ambient air quality standards under Virginia or federal law that address ambient air concentrations, impact, or emissions of carbon dioxide (or any other greenhouse gases). Because carbon dioxide is not a regulated pollutant in Virginia -- that is there are no standards by which DEQ can evaluate impacts and impose standards and conditions for carbon dioxide or other greenhouse gas emissions -- DEQ could not develop emission estimates, engineering analyses, cost estimates, regulatory reviews, and evaluation of less carbon-intensive technology.

"DEQ Response to Public Comments for the PSD Permit," p. 17 (June 13, 2008).

The Coalition cites Massachusetts v. EPA, 549 U.S. 497, 528-29 (2007), as authority for its assertion that $CO_2$ is subject to regulation under the CAA. However, the Court in Massachusetts held that the EPA has the *authority* under the CAA to regulate greenhouse gas emissions from new motor vehicles because greenhouse gases fit within the definition of "air pollutant." Id. Whether EPA would in fact regulate greenhouse gas emissions was a matter to be decided by EPA upon remand. Id. at 528-35. The Court did not hold that $CO_2$ is currently subject to regulation under the CAA. In addition, the Massachusetts Court did not address the issue of whether $CO_2$ is a pollutant "subject to regulation" under the CAA. Furthermore, the case concerned mobile source emissions of $CO_2$, not stationary source emissions as in the VCHEC case.

The Coalition also relies on In re Deseret Power Elec. Coop., 2008 EPA App. LEXIS 47 (E.A.B. Nov. 13, 2008). In that case, the Environmental Appeals Board of the EPA concluded

that the meaning of the term "subject to regulation under this Act" . . . is not so clear and unequivocal as to preclude the [permitting] Agency from exercising discretion in interpreting the statutory phrase. Thus we find no evidence of a Congressional intent to compel EPA to apply BACT to pollutants that are subject only to monitoring and reporting requirements.

Id. at 122.

In addition, the Board in Deseret stated, "By our holding today, we do not conclude that the CAA . . . requires the [permitting agency] to impose a $CO_2$ BACT limit." Id. at 19. In Deseret, the Board remanded the permit to the permitting authority to reconsider whether or not to impose a $CO_2$ BACT limit in that specific case because the Board found that the permitting agency's stated reason for not including a BACT limit for $CO_2$ was not sufficiently supported by the record. Id. at 122. Deseret essentially established that $CO_2$ is potentially subject to regulation. In addition, as the Coalition concedes in its brief, the Deseret ruling left the final decision whether to regulate $CO_2$ to regulators.

As stated above, $CO_2$ was subject only to monitoring and reporting requirements under the CAA at the time the VCHEC PSD permit was issued. The Coalition contends that the monitoring, reporting, and record keeping requirements for $CO_2$ clearly amount to some form of "regulation." However, not only did the Deseret opinion conclude otherwise, as stated above, but so did the EPA. On December 18, 2008, in response to the Deseret decision, EPA issued a memorandum that was "intended to resolve any ambiguity" in the phrase "any pollutant that otherwise is subject to regulation." The memorandum concludes that the phrase "exclude[s] pollutants for which EPA regulations only require monitoring or reporting but . . . include[s] each pollutant subject to either a provision in the [CAA] or regulation adopted by EPA under the [CAA] that requires actual control of emission of that pollutant." "EPA's Interpretation of Regulations that Determine Pollutants Covered By Federal Prevention of Significant

Deterioration (PSD) Permit Program," Memorandum from Stephen L. Johnson, Administrator, EPA, to Regional Administrators, p. 1 (Dec. 18, 2008) (Johnson memorandum).[1]

In addition, on December 31, 2008, the EPA Administrator issued an interpretive memorandum (December 31, 2008 interpretive memorandum) clarifying the Johnson memorandum, which stated the following:

> This memorandum contains EPA's definitive interpretation of "regulated NSR pollutant" and is intended to resolve any ambiguity in the definition, which includes "any pollutant that otherwise is subject to regulation under the Act." As of the date of the memorandum, EPA interprets this definition of "regulated NSR pollutant" to exclude pollutants for which EPA regulations only require monitoring or reporting but include all pollutants subject to a provision in the Act or regulation adopted by EPA under the Act that requires actual control of emissions of that pollutant.

"Clean Air Act Prevention of Significant Deterioration (PSD) Construction Permit Program; Interpretation of Regulations That Determine Pollutants Covered by the Federal PSD Permit Program," 73 Fed. Reg. 80,300 (Dec. 31, 2008).[2]

Moreover, in a case similar to the instant appeal, the Court of Appeals of Georgia found that "because no provisions of the CAA or [Georgia law] control or limit $CO_2$ emissions, $CO_2$ is not a pollutant that 'otherwise is subject to regulation under the [CAA].' Thus $CO_2$ is not a 'regulated NSR pollutant' in the PSD program and was not required to be controlled by use of BACT." Longleaf Energy Assocs, LLC v. Friends of the Chattahoochee, Inc., 681 S.E.2d 203,

---

[1] We also note that the Johnson memorandum states that while some states may make $CO_2$ "subject to regulation" under the CAA, this development does not require regulation of $CO_2$ by other states, citing Connecticut v. EPA, 656 F.2d 902, 909 (2d Cir. 1981). Johnson memorandum at 15.

[2] Although the Johnson memorandum and the December 31, 2008 interpretive memorandum were not promulgated as part of EPA's rulemaking authority, an "'agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Sierra Club v. Franklin County Power of Ill., LLC, 546 F.3d 918, 931 (7th Cir. 2008) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted)).

209 (Ga. Ct. App. 2009). See also Powder River Basin Res. Council v. Wyo. Dep't of Envtl. Quality, 226 P.3d 809, 824-25 (Wyo. 2010) (interpretation that $CO_2$ is not "subject to regulation" "is fully consistent with the EPA's longstanding position").

The Board incorporated into the PSD permit $CO_2$ mitigation measures offered voluntarily by Dominion. Pursuant to Paragraph 30 of the PSD permit, Dominion will repower its existing coal-fired Bremo Bluff Power Station with natural gas within two years of commencement of commercial operation of VCHEC to partially offset various emissions from VCHEC, including $CO_2$. In addition, pursuant to Paragraph 26 of the PSD permit, Dominion will use increasing percentages of biomass (wood) as fuel at the VCHEC. The Coalition asserts that by incorporating these voluntary $CO_2$ emission reduction measures into the permit, the Board was "regulating" $CO_2$, thereby subjecting it to regulation pursuant to the CAA and requiring the completion of a BACT analysis.

Although the PSD permit contains the provisions that Dominion will change the fuel used at the Bremo Power Station Plant and use a percentage of biomass as fuel at VCHEC, these provisions address only these two conditions. Neither provision refers specifically to $CO_2$. Neither provision in any way attempts to quantify the reduction in $CO_2$ emissions expected to be achieved by the voluntary measures or establishes any emission limits for $CO_2$. Indeed, the position of DEQ and the Board is that there is no regulatory framework for $CO_2$ under the CAA and there are no federal or state standards by which DEQ can evaluate impacts and impose standards for $CO_2$.[3] Therefore, we disagree with the Coalition that the inclusion of these provisions in the permit rendered $CO_2$ "subject to regulation" under the CAA.

---

[3] At the June 25, 2008 meeting of the Board at which the Board voted to issue the PSD permit, Vice Chairman Vivian Thompson stated:

By adopting the voluntary steps into this permit, we consider the following facts: Carbon dioxide is a pollutant under

Because no provision of the CAA or Virginia law controls or limits $CO_2$ emissions, $CO_2$ is not a pollutant "subject to regulation." Therefore, $CO_2$ is not a "regulated NSR pollutant" under the PSD permitting program, and the Board was not required to complete a BACT analysis to establish permit limits for $CO_2$ emissions at the time it issued the VCHEC PSD permit. Accordingly, we affirm the circuit court's decision concerning the $CO_2$ issue.

STANDARD OF REVIEW FOR PARTICULATE MATTER ISSUE

The Coalition contends the circuit court erred by approving the Board's use of $PM_{10}$ as a surrogate for the regulation and control of $PM_{2.5}$ without conducting a surrogacy analysis and demonstrating that it was reasonable to do so pursuant to National Lime Ass'n v. EPA, 233 F.3d 625 (D.C. Cir. 2000).

The circuit court's letter opinion reflects that it viewed this issue as a question of fact and reviewed the issue under the substantial evidence standard of review. The circuit court ruled that "[u]pon review of the record," the decision of the Board was "supported by substantial evidence in the record, for the reasons stated in the briefs and oral arguments of . . . the Board and Dominion."

"[An] agency's factual findings must be sustained if the record contains substantial evidence to support those findings. Code § 2.2-4027." Frederick County Bus. Park, LLC v. Dep't of Envtl. Quality, 278 Va. 207, 211, 677 S.E.2d 42, 44 (2009). "Under the 'substantial evidence' standard, the reviewing court may reject an agency's factual findings only when, on

the [CAA]. However, there is as yet no regulatory framework for carbon dioxide or greenhouse gas emissions under the [CAA], specifically under the provisions we are looking at here today.

\* \* \* \* \* \* \*

The exact emissions averted that we will get in these two combined actions are a little in question.

consideration of the entire record, a reasonable mind would *necessarily* reach a different conclusion." Alliance to Save the Mattaponi v. Commonwealth, 270 Va. 423, 441, 621 S.E.2d 78, 88 (2005).

> This standard is designed to give stability and finality to the factual findings of administrative agencies. In applying the substantial evidence standard, the reviewing court is required to take into account "the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted."

Id. at 442, 621 S.E.2d at 88 (quoting Code § 2.2-4027).

"[W]here the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts." Johnston-Willis, 6 Va. App. at 244, 369 S.E.2d at 8.

We hold that substantial evidence supported the Board's approach to controlling $PM_{2.5}$ in the PSD permit. Thus, the circuit court did not err in affirming the Board's decision.

PARTICULATE MATTER ISSUE

The Coalition contends the circuit court erred by approving the Board's use of one air pollutant regulated under the CAA, $PM_{10}$, as a surrogate for the regulation and control of another CAA regulated air pollutant, $PM_{2.5}$, without first demonstrating that it was reasonable to do so. The Coalition argues that the law at the time the permit was issued required a demonstration that VCHEC's $PM_{2.5}$ pollution would not exceed EPA-established health protection standards for ambient concentrations of $PM_{2.5}$ and that Dominion would operate best available pollution controls to limit the $PM_{2.5}$ emissions. The Coalition further asserts that the Board "blindly" relied on outdated EPA guidance documents that lacked the force of law in making its decision to use $PM_{10}$ as a surrogate. Furthermore, the Coalition contends that Dominion and the Board

were required to comply with a three-part test for the use of a surrogate pollutant established in National Lime, 233 F.3d at 637-39.

We find that substantial evidence supported the Board's decision to use $PM_{10}$ as a surrogate for $PM_{2.5}$ in establishing the permit limit for $PM_{2.5}$. The law and policy applicable at the time the Board approved the permit authorized using $PM_{10}$ as a surrogate for $PM_{2.5}$. EPA's policy was set forth in a memorandum dated October 23, 1997 entitled "Interim Implementation of New Source Review Requirements for $PM_{2.5}$" authored by John S. Seitz, Director, EPA Office of Air Quality Planning & Standards (October 23, 1997). This memorandum provided that the basis for its position that $PM_{10}$ was an appropriate surrogate for $PM_{2.5}$ was the "significant technical difficulties" that existed regarding $PM_{2.5}$ monitoring, emission estimation, and modeling. On April 5, 2005, this $PM_{10}$ surrogate policy was affirmed in another EPA memorandum.[4]

On October 10, 2006, DEQ issued a policy adopting EPA's guidance on interim implementation of NSR for $PM_{2.5}$. The DEQ guidance provided that:

> For the purpose of implementing Major New Source Review, DEQ shall use $PM_{10}$ as a surrogate for $PM_{2.5}$ as specified in the EPA guidance documents until such time as:
>
> > [1] DEQ establishes a more appropriate implementation methodology; or
>
> > [2] EPA promulgates revised implementation guidance or policy; or
>
> > [3] EPA promulgates final regulations[.]

Air Guidance Memorandum No. APG-307, "Interim Implementation of New Source Review for $PM_{2.5}$," James E. Sydnor, DEQ Air Division Director (October 10, 2006).

---

[4] "Implementation of New Source Review Requirements in PM-2.5 Nonattainment Areas," Stephen D. Page, Director, EPA Office of Air Quality Planning & Standards (April 5, 2005).

Therefore, on June 30, 2008, when the PSD permit was issued in this case, DEQ was acting within its own policy as adopted from the EPA guidance and policy applicable at the time. This policy authorized the use of $PM_{10}$ as a surrogate for $PM_{2.5}$.[5]

The Coalition also asserts that Dominion and the Board were required to apply the three-part surrogate test set forth in National Lime, 233 F.3d at 637-39, for determining whether it was reasonable to use $PM_{10}$ as a surrogate for $PM_{2.5}$. However, the National Lime test does not apply to the use of $PM_{10}$ as a surrogate for $PM_{2.5}$ in PSD permits as is the issue in this case. Rather, National Lime involved the use of PM as a surrogate for hazardous air pollutants in the context of a Maximum Achievable Control Technology (MACT) permits. Accordingly, the case is inapposite to this issue.

Furthermore, the record shows that DEQ and the Board considered the appropriateness of using $PM_{10}$ as a surrogate for $PM_{2.5}$. Because the regulation of $PM_{2.5}$ is in transition, the Board included in the PSD permit a condition requiring the review of the $PM_{2.5}$ permit limits when final $PM_{2.5}$ implementation guidance is promulgated. In addition, the permit requires VCHEC to conduct an ambient air quality analysis of its $PM_{2.5}$ emissions when final $PM_{2.5}$ implementation guidance, policy, or rules are promulgated. We also note that, during the permitting process, Dominion conducted a modeling study to assess VCHEC's $PM_{2.5}$ ambient air quality impacts. In DEQ's Response to Public Comments, DEQ stated that this assessment demonstrated compliance with the $PM_{2.5}$ NAAQS.

---

[5] One month prior to the issuance of the PSD permit, EPA promulgated a final regulation, which took effect on July 15, 2008, and provided that the PSD program would no longer use a $PM_{10}$ program as a surrogate. However, as the Coalition acknowledges, the regulation also provided that states with an approved SIP, which includes Virginia, would continue to be authorized to use $PM_{10}$ as a surrogate for $PM_{2.5}$ for a three-year transition period. "Implementation of the New Source Review (NSR) Program for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$)," Fed. Reg. 28,321, 28,340-28,341 (May 16, 2008).

The decision by DEQ and the Board to use $PM_{10}$ as a surrogate for $PM_{2.5}$ was consistent with federal regulations and state guidance in effect at the time the permit was issued.[6] Taking into account "the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted" the decision was supported by substantial evidence in the record. See Code § 2.2-4027.

For the foregoing reasons, the decision of the circuit court is affirmed.

Affirmed.

---

[6] The Coalition cites EPA regulatory action taken after the permit was issued in this case. However, any subsequent decision by EPA to reconsider or reinterpret their guidance and policy applicable at the time the permit was issued in this case does not apply to the issues at hand. The issuance of the PSD permit was a case decision. See Commonwealth v. County Utilities, 223 Va. 534, 541, 290 S.E.2d 867, 871 (1982) (State Water Control Board's issuance of permit was case decision). Code § 2.2-4001 provides that a case decision is rendered in light of the laws and regulations in effect at the time of the decision.