**Douglas GIEBEL, Plaintiff–Appellee,**

v.

**Stephen SYLVESTER, Dr., in his capacity as Chairman, Department of Humanities and Social Sciences, Montana State University, Northern Havre, MT, Defendant–Appellant.**

No. 99–36105.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2001

Filed April 12, 2001

Douglas Giebel, Big Sandy, Montana, plaintiff-appellee, pro se.

Norman C. Peterson, Special Assistant Attorney General, Helena, Montana, for the defendant-appellant.

Before: REINHARDT, WARDLAW, and RONALD M. GOULD, Circuit Judges.

REINHARDT, Circuit Judge:

In this case, we must decide whether a professor at a state university who removes handbills publicizing an appearance of a former colleague at a conference to be held on the university campus is entitled to qualified immunity. Ironically, the subject of the conference was "Intellectual Freedom." We have no doubt that the removal of the handbills constituted a First Amendment violation, and that at the time of the alleged conduct there was no uncertainty in the law as to this question.

## I. BACKGROUND[1]

■ Douglas Giebel was a professor at Montana State University--Northern until 1995, when, after an acrimonious process similar to that which frequently occurs in institutions of higher education at the time of the initial hiring of a faculty member or an award of tenure, his contract was not renewed. Stephen Sylvester was the chairman of Giebel's department, and one of his adversaries in the contract renewal dispute.[2]

In the Spring of 1996, about a year after the termination of Giebel's employment, the university sponsored a conference on "Intellectual Freedom" and arranged for the participation of about twenty-five speakers. Giebel was scheduled to be one. When the conference was publicized, Giebel posted his own handbills on campus

bulletin boards announcing his upcoming speech.[3] Giebel's affidavit states that the university had "set aside [its bulletin boards] for common use by both university-related persons and the general public" to communicate with "students and others at the University," and Sylvester has introduced no evidence to the contrary.[4] Nevertheless, Giebel alleges, Sylvester tore down his handbills. He also alleges that Sylvester's actions were directed against him exclusively, and that materials posted by other persons were not torn down. After the removal of his handbills, Giebel withdrew as a speaker at the conference because, he alleges in his complaint, he "fear[ed] further retaliation and disruption" of his speech.

Almost two years after his handbills were removed, Giebel filed a 42 U.S.C. § 1983 action in federal court against Sylvester claiming a violation of his First Amendment rights and seeking a declaratory judgment and damages. Sylvester filed a motion for summary judgment, arguing that he was entitled to qualified immunity because Giebel had failed to allege a First Amendment violation, and that, even if he had, the asserted First Amendment right was not clearly established at the time of Sylvester's actions. The district court denied Sylvester's motion, and Sylvester filed an interlocutory appeal.

1. Because we are reviewing an order that resolves a summary judgment motion, all evidence must be viewed in the light most favorable to the non-moving party, *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998), and all genuine conflicts raised by the evidence must be resolved in favor of that party. *Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Accordingly, for purposes of this opinion, to the extent that any factual dispute exists, Giebel's version of the events is accepted. Specifically, we assume, for purposes of the opinion, that Sylvester tore down Giebel's handbills.

2. The hiring dispute is the subject of another action that was before this court. *See Giebel v. Sylvester*, No. 99–35261, 2001 WL 201525 (9th Cir. Feb.26, 2001) (unpublished disposition). In that appeal, we affirmed the district

court's order granting summary judgment for Sylvester. *Id.* at *2.

3. The posters read in their entirety as follows:
 "Former MSU–NORTHERN Faculty Member DOUG GIEBEL
 Will Speak on the topic *The Regents, The Plan and Academic Responsibility*
 The Second Annual Conference on Intellectual Freedom
 Donaldson Commons
 Friday, April 19 9:00 a.m."

4. The record does include an affidavit from Sylvester explaining that one bulletin board in the building in which he works was restricted, and that notices posted there required prior approval. This opinion does not consider the legality of the removal of any notices from that board.

# 1186

## II. JURISDICTION

■ Sylvester appeals the district court's order denying his motion for summary judgment. The "district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' ... notwithstanding the absence of a final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In his summary judgment motion, Sylvester argued that, assuming the facts as alleged by Giebel to be true,[5] his conduct did not violate Giebel's First Amendment rights, and that even if it did, he was entitled to qualified immunity. Because this qualified immunity appeal "turns on an issue of law," and not a factual dispute, we have jurisdiction to hear it. *Id.*[6]

## III. FIRST AMENDMENT VIOLATION

■ In analyzing a qualified immunity defense, we must first decide whether, assuming that the facts are as alleged by the plaintiff, the defendant violated the plaintiff's constitutional rights. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Only if we answer that question in the affirmative do we

5. Sylvester also contests Giebel's factual assertions, but neither his summary judgment motion nor this appeal requires the resolution of any factual dispute.

6. Giebel argues that this court lacks jurisdiction because the district judge did not actually decide whether Sylvester was entitled to qualified immunity. He is correct that the district court's order denying Sylvester's motion does not discuss the question whether qualified immunity should be granted, and instead appears to deny the motion either on the basis that an underlying factual dispute exists, or that a constitutional violation occurred. Notwithstanding the fact that the district court dismissed Sylvester's motion without expressly analyzing his qualified immunity argument, the order plainly denied the qualified immunity motion, and therefore "necessarily determined that certain conduct attributed to petitioner (which was controverted) constituted a violation of clearly established law." *Behrens v. Pelletier,* 516 U.S. 299, 313, 116 S.Ct. 834,

then turn to the issue whether the constitutional right was clearly established. *Id.*

■ Sylvester argues that tearing down Giebel's handbills did not violate the First Amendment because: (1) Giebel's handbills did not seek to communicate ideas and therefore did not contain expressive content protected by the First Amendment, and (2) the university provided Giebel an opportunity to speak in another forum, namely at the conference.[7] We consider these arguments in turn.

### 1. *Handbills as speech.*

■ Sylvester argues that Giebel's handbills were not speech, claiming that they lacked "expressiveness of content," and going so far as to label them "nonverbal conduct." Because the handbills merely "announce[d] a speech," he reasons, they are not entitled to First Amendment protection.

■ The argument that handbills announcing a subsequent speech are not, in and of themselves, speech protected by the First Amendment is patently wrong. Such handbills are posted for the purpose of conveying information and, to the extent that they are observed before being torn down, do so. In general, words communi-

133 L.Ed.2d 773 (1996). Accordingly, under *Mitchell,* we have jurisdiction to consider this interlocutory appeal.

7. Sylvester also argues that by holding only that if he committed the alleged conduct he "may" have violated Giebel's First Amendment rights, the district court erred by failing actually to decide whether the alleged facts state a First Amendment violation. He may be correct. *See Wilson,* 526 U.S. at 609, 119 S.Ct. 1692. (It is also possible that the district court was simply trying, albeit inartfully, to avoid expressing a premature conclusion as to Sylvester's actual conduct.) However, we may affirm the district court on any ground that supports its judgment, *Western Center for Journalism v. Cederquist,* 235 F.3d 1153, 1157 (9th Cir.2000), and we do so here to the extent necessary. Whether or not the district court concluded that the alleged conduct states a First Amendment violation, we now hold that it does. *See infra* pp. 1186–89.

cating information are "speech" within the meaning of the First Amendment, whether or not the words convey important ideas. *See, e.g., 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (holding that the First Amendment protects advertisement of liquor prices). While narrow categories of speech, such as obscenity, are wholly outside the First Amendment, no court has ever suggested that notices of upcoming speeches or events constitutes a category of speech not subject to First Amendment protection. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382–83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (listing categories of speech that are not protected by the First Amendment).[8]

■ That speech is protected by the First Amendment even if it is merely informative and does not actually convey a position on a subject matter was made clear in *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In *Schaumburg,* the Supreme Court reviewed an ordinance prohibiting certain door-to-door solicitation by a non-profit organization, and held that mere "communication of information … [is] within the protection of the First Amendment." *Id.* Five years later, in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court considered whether *Schaumburg* extended to informative speech in written form, as opposed to speech conducted face-to-face (in which dialogue is possible). In *Cornelius,* the NAACP, a non-profit organization, challenged the government's exclusion of its thirty-word description of itself from government pamphlets seeking charitable contributions. *Id.* at 798. The pamphlets,

which were distributed to federal employees exclusively, contained descriptions of other non-profit groups. *Id.* By regulation, the short descriptions were not permitted to be "persuasive speech." *Id.* at 798–99. Nevertheless, after specifically considering the purpose of the descriptions, and determining that their authors intended them to convey information that could be of use to those who read them, the Court held that the notices were speech protected by the First Amendment.[9] *Id.* at 799.

Giebel's handbill, like the NAACP's self-description, could be viewed as a mere advisory notice not designed to persuade those who read it. Still, like the NAACP's material in *Cornelius,* it was designed to communicate information to the reader. It is not the role of the courts to weigh the importance of the information conveyed, and we do not do so here. Instead, we conclude that, because Giebel's handbill was designed to convey information, it constitutes a form of speech protected by the First Amendment.

2. *Alternative forum for Giebel's speech.*

■ Sylvester also argues that removing Giebel's handbills did not violate the First Amendment because the university provided Giebel with another forum for his speech, namely the "Intellectual Freedom" conference. However, Giebel does not claim that Sylvester's action is unlawful on the theory that he was completely deprived of a forum for his speech. Rather, he argues that Sylvester denied him access to a forum to which he was entitled. The fact that another forum was made available to Giebel simply has no relevance to the First Amendment issue posed here:

8. In *R.A.V.,* the Supreme Court noted that even speech traditionally considered "outside" of the First Amendment is actually subject to *some* First Amendment protection. 505 U.S. at 383–84, 112 S.Ct. 2538.

9. In *Cornelius,* the Court ultimately concluded that the government's charitable contributions pamphlet was not a public forum and

that the exclusion of the NAACP's material from the pamphlet did not violate the First Amendment. 473 U.S. at 806, 813, 105 S.Ct. 3439. However, its holding that the government was not required to include the protected speech in its pamphlet in no way derogates from its conclusion that the speech was protected by the First Amendment.

whether Sylvester was justified in preventing Giebel from communicating with the university community in the manner he did by posting handbills on what Giebel asserts is a public forum—the university's bulletin boards.

 When the government opens a forum to the public and does not "consistently enforce[ ] ... restrictions on the use of the forum," it creates a designated public forum. *Hopper v. City of Pasco,* 241 F.3d 1067, 1075 (9th Cir.2001). In such a forum, a state is bound by the same First Amendment limitations that apply in traditional public fora, such as streets and public parks. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Here, Giebel has put forth uncontradicted evidence that the university's bulletin boards are available for use by the public, including persons not affiliated with the university, "to communicate with students and others at the University." His evidence shows that the university has no policy or practice of regulating the content of the materials placed on university bulletin boards. Accordingly, we conclude that the university's bulletin boards are a designated public forum.

 In general, the extent of the protection afforded by the First Amendment in designated public fora depends on whether the suppression of the speech is on the basis of the "viewpoint" expressed by the speech or the "content" of the speech. *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). "Content discrimination" occurs when the government "choos[es] the subjects" that may be discussed, while "viewpoint discrimination" occurs when the government prohibits "speech by particular speakers," thereby suppressing a particular view about a subject. *See Perry,* 460 U.S. at 59, 103 S.Ct. 948 (Brennan, J., dissenting).[10] In this case, it is not altogether clear whether Sylvester's alleged suppression of Giebel's speech should be classified as content-based or viewpoint-based.

 We conclude that Sylvester's alleged actions are most appropriately treated as viewpoint discrimination, because Sylvester sought only to silence speech by a particular speaker—Giebel—rather than speech by all non-university speakers or by all speakers promoting the conference and its participants.[11] The "viewpoint" that was suppressed was that which Giebel intended to express at the conference. The purpose of the notices was to attract an audience for Giebel's speech. Of course, speech can only have an effect if it is heard. Suppression of notices announcing an upcoming speech is suppression of the view to be communicated through the speech, because a speech to an empty auditorium, no matter how brilliant it may be or how persuasive its

**10.** The coherence of the distinction between "content discrimination" and "viewpoint discrimination" is tenuous. *See* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum,* 34 UCLA L.Rev. 1713, 1751 & n. 155 (1987). While the former describes the subject matter of speech, and the latter the specific positions taken on the matter, *id.,* the level at which "subject matter" is defined can control whether discrimination is held to be on the basis of content or viewpoint. For example, should a library's decision to exclude all books concerning astrology be treated as content discrimination, because astrology is a subject matter about which astrologers (and others) may have different views, and the library has excluded all discussion of that subject matter? Or should such a policy be treated as viewpoint discrimination because with respect to the subject matter of the study of the heavens, the library affords preferential treatment to the science of astronomy and bans the study of astrology? Whether or not the content-viewpoint distinction can withstand rigorous scrutiny, the Supreme Court continues to rely on it, and accordingly we do the same in this opinion.

**11.** Under some circumstances, of course, prohibiting notices of particular conferences could constitute viewpoint discrimination. For example, state university administrators could not bar notices of a conference regarding Democratic party politics while permitting notices of a similar conference regarding the Republican party.

delivery, does not convey any message to anyone.[12] Because it is "axiomatic" that viewpoint-based suppression of speech is impermissible, *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510, we conclude that Sylvester's alleged actions violated Giebel's First Amendment rights.[13]

## IV. QUALIFIED IMMUNITY

Sylvester also argues that, even if his alleged actions constitute a First Amendment violation, he is entitled to qualified immunity. He asserts that the First Amendment right at issue was not "clearly established and stated with particularity" when, in early 1996, the handbills were removed.[14] *Blueford v. Prunty*, 108 F.3d 251, 253 (9th Cir.1997).

"[P]recedent directly on point is not necessary to demonstrate" that a right is clearly established. *Id.* at 255. Rather, if "the unlawfulness [is] apparent in light of preexisting law," then the standard is met. *Id.* at 254. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of "common sense." *DeBoer v. Pennington*, 206 F.3d 857, 865 (9th Cir.2000), *petition for cert. filed*, (U.S. Aug. 7, 2000) (No. 00–222).

Both common sense and closely analogous case law lead us to conclude that it was clearly established long before 1996 that Giebel's handbills were a form of speech protected by the First Amendment. Since the earliest days of the Republic, it has been understood that information conveyed in handbills on matters of public interest is speech within the ambit of First Amendment protection. For those without the resources to purchase advertisements in newspapers or time on television, the handbill has been an indispensable means of informing the public of upcoming public events, including discussions of important issues. The Supreme Court has consistently tried to make it clear that the First Amendment protects the rights of all persons to proclaim their views for all to hear without interference by the state. Indeed, prohibitions on the distribution of pamphlets "engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution." *Schneider v. State of New Jersey*, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Leaflets "have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest." *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938). In short, the distribution of leaflets, one of the "historical weapons in the defense of liberty," is at the core of the activity protected by the First Amendment. *Schneider*, 308 U.S. at 162, 60 S.Ct. 146.

12. In fact, were we to view the issue in the philosophical framework within which Bishop Berkeley discussed the oft-repeated tree-falling-in-the-forest question, we might ask whether the speaker was even able to *express* any views, were no-one around to hear him.

13. Even were we to treat Sylvester's action as content-based, it would still be unlawful. In a designated public forum, any "content-based prohibition[s] must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. Sylvester has advanced no interest justifying the removal of Giebel's handbills, and it is difficult to believe from the record before us that any legitimate interest existed.

14. Sylvester also asserts that the district court relied on only one case to demonstrate that the law was clearly established, and that the case relied on was decided after the handbills were removed. (In fact, the district court's order denying Sylvester's summary judgment motion cites no cases at all.) Furthermore, he claims that the lack of relevant authority offered by the (pro se) plaintiff to support his argument that the law is clearly established is a ground for reversal. In fact, when determining whether qualified immunity is appropriate, this court must consider "all relevant precedents, not simply those cited to, or discovered by, the district court." *Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Whether the law was clearly established is a question of law for the court to determine *de novo*. *Id.* at 516, 114 S.Ct. 1019.

The law was clearly established in 1996 that removal of Giebel's handbills from a designated public forum was contrary to the First Amendment. *Rosenberger* unequivocally states that it is "'axiomatic'. that the government [cannot] regulate speech based on ... the message it conveys." *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510. What was "axiomatic" when *Rosenberger* was decided in 1995 was clearly established long before then. *Metro Display Adver., Inc. v. City of Victorville*, 143 F.3d 1191, 1195–96 (9th Cir. 1998). Moreover, as we explained earlier, a straightforward application of *Schaumburg* and *Cornelius* mandates the conclusion that the content of Giebel's handbills is speech protected by the First Amendment.

Almost thirty years ago, in a case considering the right of university students to organize a chapter of the Students for a Democratic Society, the Supreme Court expressly discussed the critical importance of the function that public notices serve. *See Healy v. James*, 408 U.S. 169, 176–77, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The Court declared that the student organization's "ability to participate in the intellectual give and take of campus debate" was severely limited by the university's policy of prohibiting the organization from posting notices of upcoming meetings on campus bulletin boards and in the school newspaper. *Id.* at 181–82, 92 S.Ct. 2338. While *Healy* involved a more extensive denial of the exercise of First Amendment rights, the opinion unquestionably afforded university officials notice that handbills regarding upcoming events posted on university bulletin boards constitute speech protected by the First Amendment. In light of history, a solid body of Supreme Court decisions, and common sense, we reject any contention that the First Amendment violation alleged in this case was not clearly established, and conclude that Sylvester is not entitled to qualified immunity.

1. The panel unanimously finds this case suitable for submission without oral argument

## V. CONCLUSION

The district court's order denying qualified immunity for Sylvester is affirmed. We conclude that, accepting Giebel's version of the evidence and viewing it in the light most favorable to him, Sylvester violated Giebel's clearly established First Amendment right to post handbills informing the public of his upcoming speech at the "Intellectual Freedom" conference.

AFFIRMED.