# CIRCUIT COURT OF THE CITY OF CHESAPEAKE

Sean Andrew Bujno

v.

Commonwealth of Virginia,
Department of Motor Vehicles,
and Richard D. Holcomb,
Commissioner,
Department of Motor Vehicles

November 2, 2012

Case No. (Civil) CL12-1119

BY JUDGE JOHN W. BROWN

On May 25, 2007, the Department of Motor Vehicles ("DMV") issued Petitioner, a former Marine, "ICUHAJI" vanity tags for his personal car. Earlier in 2007, Petitioner's father attempted to obtain "HAJIKLR" tags for Petitioner's car, but the DMV denied that request. On November 3, 2011, the DMV wrote to Petitioner and asked him to return his "ICUHAJI" tags because they were being revoked. The DMV revoked the tags because they violated the DMV's "Review and Issuance of Personalized Plates" guidelines' (the "Guidelines") prohibition against letter combinations that

"may be reasonably seen by a person viewing a license plate as socially, racially, or ethnically offensive or disparaging." DMV Letter, at *1 (Nov. 3, 2011); Va. Dep't of Motor Vehicles, *Review and Issuance of Personalized Plates*, at 1 (Mar. 19, 2010) (hereinafter "*Guidelines*").

The Guidelines govern the DMV's review process of personalized plates. The Guidelines prohibit plates that contain "any combination of characters that in any way carries a connotation that may reasonably be seen by a person viewing the license plate as: (1) Profane, obscene, or vulgar in nature; (2) Sexually explicit or graphic; (3) Excretory-related; (4) Used to describe intimate body parts or genitals; (5) Used to describe drugs, drug culture, or drug use; (6) Use to condone or encourage violence; (7) Used to describe illegal activities or illegal substances; and/or (8) Socially, racially, or ethnically offensive or disparaging." *Guidelines*, at 1. The Guidelines govern the DMV's review of personalized plates. The DMV provided Petitioner with a copy of the Guidelines when it notified him of his informal appeal conference, and a copy is included in the appellate record.

Apparently, the DMV received a complaint from a motorist who claimed that Petitioner's plates were offensive. It was also reported that Petitioner's car had a bumper sticker that read "God Bless Our Troops / Especially Our Snipers." Upon receipt of the DMV's November 3, 2011, letter, Petitioner timely requested an informal appeal conference. That conference was held on February 16, 2012, and Petitioner appeared by telephone and presented evidence. DMV Commissioner Richard D. Holcomb affirmed the revocation of Petitioner's plates because they could reasonably be interpreted as "socially, racially, or ethnically offensive or derogatory." DMV Informal Conference Decision, at *3 (Apr. 4, 2012). It is clear that the Commissioner considered the wording of Petitioner's bumper sticker when he made his decision. *Id.* at *2. Petitioner appealed the Commissioner's decision to this Court, and the Court heard the parties' arguments on August 21, 2012.

## Issues

Petitioner has alleged two errors of law as the basis for his appeal. First, Petitioner argues that the Guidelines' prohibition against "[s]ocially, racially, or ethnically offensive or disparaging" letter combinations is not "viewpoint neutral." Accordingly, Petitioner argues that the DMV violated his First and Fourteenth Amendment rights when it relied on this prohibition to revoke his tags. Second, Petitioner argues that the Guidelines did not allow the DMV to consider his "God Bless Our Troops / Especially Our Snipers" bumper sticker as evidence when it determined whether his plates violated the Guidelines.

Further, unrelated to the merits of Petitioner's appeal, the Attorney General argues that Commissioner Holcomb is not a proper party to this appeal because he is not a "party" as defined by Va. Sup. Ct. R. 2A:1.

34

*Standard of Review*

Virginia Code § 2.2-4027 governs judicial review of agency action. On appeal of an agency decision, this Court may examine (1) whether the agency acted in accordance with the law, (2) whether the agency made a procedural error that impaired the party's substantive rights, and (3) whether there is sufficient evidence in the record to support the agency's factual findings. Va. Code § 2.2-4027; *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 241-42, 369 S.E.2d 1, 7 (1988).

Since agency action is presumed correct, the complaining party must demonstrate an error of law that is subject to review. *Environmental Def. Fund, Inc. v. Ramirez*, 15 Va. App. 271, 277, 422 S.E.2d 608, 611 (1992). Claimed errors of law fall into two categories, first, whether the agency acted within the scope of its authority, and, second, whether the decision is supported by the evidence. *Kenley*, 6 Va. App. at 242, 369 S.E.2d at 7. Unless a legal issue falls within an agency's particular area of expertise, questions of law are reviewed *de novo*. *Ramirez*, 15 Va. App. at 278, 422 S.E.2d at 612. Thus, even when agency action is supported by substantial evidence, the agency's decision must be set aside if judicial review reveals a failure to observe the agency's procedures and regulations, the governing statutory authority, or other law. *Id.*

As for factual issues, the Court may only determine whether there is substantial evidence in the record to support the agency's decision. *Kenley*, 6 Va. App. at 242, 369 S.E.2d at 7. Unless a reasonable mind would necessarily reach a different conclusion, the Court must accept the agency's factual findings. *Id.*

Petitioner, however, argues that Va. Code § 2.2-4025(v) exempts this matter from review under Va. Code § 2.2-4027. Specifically, Petitioner claims that this appeal "encompasses matters subject by law to a trial *de novo* in any court" because he raises constitutional questions. Va. Code § 2.2-4025(v).

Having reviewed the relevant law, this Court finds that Petitioner's argument is misplaced. First, the mere fact that this appeal raises constitutional questions does not mean that Va. Code § 2.2-4027 does not apply. *Turner v. Jackson*, 14 Va. App. 423, 430, 417 S.E.2d 881 (1992) ("[T]he fact that this case may involve questions of constitutional or procedural rights does not, standing alone, require the reviewing court to apply a less deferential standard of review to the agency's decision."). Second, § 2.2-4025(v) exempts agency appeals from § 2.2-4027 if the legislature has specifically provided an avenue outside of the Virginia Administrative Procedure Act (VAPA) to challenge agency action. *School Bd. of the Cnty of York v. Nicely*, 12 Va. App. 1051, 1061-62, 408 S.E.2d 545, 550-51 (1991).

In *Nicely*, the York County School Board appealed a Virginia Board of Education decision by bringing an action in the circuit court under Va. Code § 22.1-214(D). *Id.* at 1054, 547. When the respondent argued that

the appeal was untimely under the VAPA, the school board responded that § 22.1-214(D) allows an aggrieved party to challenge a Board of Education decision by bringing a suit outside of the VAPA's appeal procedures and that the VAPA's timing requirements did not apply. *Id.* at 1055, 547. The court of appeals agreed with the school board. *Id.* at 1064, 552. The VAPA provides default procedures when other law does not provide a separate avenue of *de novo* review in the circuit court. *Id.* at 1058, 549. It explained that, since § 22.1-214(D) provides that a party may appeal a Board of Education decision outside of the VAPA, § 2.2-4025(v) exempted the appeal from the VAPA. *Id.* at 1064, 552.

Here, however, Petitioner has failed to cite any statute that allows a party to appeal a DMV decision regarding the issuance and revocation of vanity license plates by bringing an action outside of the VAPA. Accordingly, this Court agrees with Respondents and rules that § 2.2-4027 governs this appeal.

*Discussion*

I. *Is Commissioner Holcomb a proper party?*

A. *Respondents argue that Commissioner is not a proper party.*

Respondents argue that Commissioner Holcomb is not a proper party to this appeal because he is not a "party" as defined by Va. Sup. Ct. R. 2A:1. Virginia Code § 2.2-4026 states that those aggrieved by agency action shall have a right to direct review in a timely court action "against the agency or its officers or agents in the *manner* provided by the rules of the Supreme Court of Virginia." (emphasis added). Thus, appeals from administrative agencies are procedurally governed by the rules of the Supreme Court of Virginia. *State Water Control Bd. v. Crutchfield*, 265 Va. 416, 423, 578 S.E.2d 762, 766 (2003).

For the purposes of administrative appeals to the circuit court, Va. Sup. Ct. R. 2A:1 defines a "party" as "any person affected by and claiming the unlawfulness of a regulation, or a party aggrieved who asserts a case decision is unlawful or any other affected person or aggrieved person who appeared in person or by counsel at a hearing, as defined in § 2.2-4001, with respect to the regulation or case decision as well as the agency itself." Virginia Sup. Ct. R. 2A:2 requires an appealing party to file a notice of appeal with the agency secretary and to mail notice to "each of the parties." *Id.* In addition, the petition must be served on the agency secretary and "every other party." Va. Sup. Ct. R. 2A:4.

## B. *The Commissioner is a proper party.*

After review of counsel's arguments and the relevant law, this Court rules that the Commissioner is a proper party. Virginia Code § 2.2-4026 gives affected persons the *substantive* "right to the direct review" of agency action "by an appropriate and timely court action against the agency *or its officers or agents*," and Va. Sup. Ct. R. 2A prescribes the "manner" in which affected persons may avail themselves of that right. (Emphasis added.) "Party," as defined by Va. Sup. Ct. R. 2A:1, simply instructs who must be served and noticed before an appeal may go forward. It does not restrict an affected person's substantive right to seek review against "the agency or its officers or agents."

## II. *Did the DMV violate Petitioner's First and Fourteenth Amendment rights by revoking his vanity plates?*

Petitioner primarily contends that the DMV's revocation of his plates violated his First and Fourteenth Amendment rights. Specifically, Petitioner argues that the DMV violated his rights when it relied on the Guidelines' prohibition of letter combinations that may reasonably be understood as "[s]ocially, racially, or ethnically offensive or derogatory" to revoke his plates. *Guidelines*, at 1. *See also* DMV Informal Conference Decision, at *2 (Apr. 4, 2012); DMV Letter, at *1 (Nov. 3, 2011). According to Petitioner, this prohibition is not "viewpoint neutral," and is thus unconstitutional.

Since this matter is on appeal from an informal DMV appeal conference, this Court must accept the DMV's factual findings unless they are not supported by substantial evidence. Whether a regulation violates the Constitution, however, is a question of law that this Court considers *de novo. Kenley*, 6 Va. App. at 243-44, 369 S.E.2d at 8 (noting that, "[i]f the issue [of law] falls outside the area generally entrusted to the agency and is one in which courts have a special competence, i.e. . . . constitutional law, there is little reason for the judiciary to defer" to the agency" (internal quotations omitted)).

## A. *Is the speech in question private speech?*

In that "impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks," the first step of the constitutional inquiry is whether the speech at issue is private or government speech. *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles* (*SCV*), 288 F.3d 610, 618 (4th Cir. 2002).

### 1. *The speech in question is private speech.*

To determine whether speech is government or private speech, the Fourth Circuit has instructed trial courts to examine: "(1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech." *Id.* (internal quotations omitted).

Applying the above factors, the Court finds that the speech in question is private speech. First, the relevant forum is Virginia's vanity-plate program. The program's primary purpose is to raise revenue while "allowing for the private expression of various views." Id. at 619. Thus, for Virginia, the focus is revenue, while for individuals, it is a chance to make a statement. Second, Virginia exercises little editorial control over vanity plates. Other than the Guidelines' limited prohibitions, an individual may place any combination of letters on the tag. Third, although the tag belongs to the Commonwealth,[1] the literal speaker is the plate holder who selects the message and affixes the plate to his or her car. Id. at 621; see also Planned Parenthood of S.C. v. Rose, 361 F.3d 786, 794 (4th Cir. 2004) (noting that a plate holder is the literal speaker). Finally, because the plate holder decides whether to obtain a vanity tag and selects its message, the plate holder is ultimately responsible for the message. Rose, 361 F.3d at 794; SCV, 288 F.3d at 621.

Thus, Virginia created a forum for speech that it uses for revenue, but it does not speak or exercise extensive control over the forum, and the speech at issue is private speech.

### B. *What type of forum is Virginia's vanity-plate program?*

Even though the speech at issue is private speech, the Court must still determine the type of forum in which Petitioner seeks to speak. When the government attempts to regulate private speech on government property, the Court must classify the forum so the Court can apply the correct standard of review. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983). Since Virginia license plates remain Virginia property, Va. Code § 46.2-713, Petitioner was speaking on government property, and the Court must determine whether Virginia's vanity-plate program is a traditional public forum, a designated public forum, or a nonpublic forum.

---

1. Va. Code § 46.2-713 ("Every license plate and decal issued by the Department shall remain the property of the Department and shall be subject to be revoked, cancelled, and repossessed by the Department at any time. . . .").

### 1. Forum Analysis

The Supreme Court, in *Perry Educ. Ass'n*, created the basic framework of forum analysis. 460 U.S. at 45. Traditional public forums are those that "by long tradition or by government fiat have been devoted to assembly and debate." *Id.* Traditional public forums include public streets, parks, and sidewalks. *Id.* Designated public forums are created when the government intentionally grants speakers access to public property for expressive purposes. *SCV*, 288 F.3d at 622, n. 10. Like traditional public forums, designated public forums are open for expressive use by the public. *Id.*

Nonpublic forums, however, are not open for indiscriminate use by the public. *Id.* In nonpublic forums, the government "reserves eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' " to use the forum. *Id.* (quoting *Arkansas Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)).

The forum in question is Virginia's vanity-plate program, and private individuals are permitted to speak on Virginia license plates subject to the Guidelines. It is undisputed that Virginia's vanity-plate program is not a traditional public forum. To determine whether a forum is a designated public forum or a nonpublic forum, courts apply a two-factor test. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). Specifically, courts look at: (1) the government's policy and practice "to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," and (2) "the nature of the property and its compatibility with expressive activity." *Id.*

### 2. Virginia's vanity-plate program is a nonpublic forum.

Here, Virginia's policy and practice is to require a plate holder to seek approval before speaking on a Virginia plate. In addition, the nature of the forum limits its utility as an expressive medium. A speaker can only make so profound a message with two to seven characters. *See, e.g., Choose Life Ill. v. White*, 547 F.3d 853, 865 (7th Cir. 2008) ("License plates are not by nature compatible with anything more than an extremely limited amount of expressive activity.").

Thus, because a speaker must obtain permission to speak and because a speaker's message is physically limited, Virginia did not open the forum to free expression by the public at large, and the forum is a nonpublic forum. *See, e.g., Perry v. McDonald*, 280 F.3d 159, 167-68 (2d Cir. 2001) (reasoning that Vermont's very similar vanity-plate program is a nonpublic forum).

C. *Do the Guidelines unconstitutionally regulate speech in a nonpublic forum?*

Government regulation of private speech in a nonpublic forum is permissible if the regulations are viewpoint neutral and otherwise reasonable. *Perry Educ. Ass'n*, 460 U.S. at 46 ("In addition to time, place, and manner regulations, the State may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

### 1. *Viewpoint discrimination is unconstitutional.*

Within a nonpublic forum, the Supreme Court has recognized a "distinction between . . . content discrimination, which may be permissible if it preserves the [forum's] purposes," and "viewpoint discrimination, which is presumed impermissible." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995). The line between "a permissible content-based restriction and an impermissible viewpoint-based restriction" is hard to discern. *White*, 547 F.3d at 865. The Fourth Circuit has suggested that content-based restrictions restrict "the subject matter of the speech," while viewpoint-based restrictions restrict the "specific positions taken on the matter." *SCV*, 288 F.3d at 624, n. 11 (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1188, n. 10 (9th Cir. 2001). Thus, viewpoint restrictions are a subset of content-based restrictions. *Rosenberger*, 515 U.S. at 829 ("Viewpoint discrimination is thus an egregious form of content discrimination.").

Viewpoint discrimination occurs when (1) the government discriminates against offensive, unpopular, or disfavored views or messages, or (2) when the government removes a competing perspective from a forum or debate. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) (noting that the government may not prohibit a viewpoint solely because it is disagreeable); *Rosenberger*, 515 U.S. at 831 (noting that the government may not exclude religious viewpoints on particular subjects while allowing all other viewpoints).

*Texas v. Johnson* stated that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." 491 U.S. at 414 (citations omitted). In *Johnson*, the appellee was convicted for intentionally burning a U.S. flag in a way that he knew would "seriously offend" others. *Id.* at 411 ("Johnson was prosecuted because he knew that his politically charged expression would cause 'serious offense.' If he had burned the flag as a means of disposing of it because it was dirty or torn, he would not have been convicted of flag desecration under this Texas law.").

The Court held that because the Texas statute only prohibited intentional flag burning with knowledge that it would offend, and not burning that

promotes the flag's role as a symbol of national unity,[2] the statute made an impermissible viewpoint distinction. *Id.*, at 416-17. To hold otherwise would permit a state to " 'prescribe what shall be orthodox' by saying that one may burn the flag to convey one's attitude toward it . . . only if one does not endanger the flag's representation of nationhood and national unity." *Id.*, at 417. Thus, because the statute impermissibly silenced a disagreeable viewpoint, it was unconstitutional. *Id.*

*Rosenberger v. Rector & Visitors of the Univ. of Va.* held that the government may not exclude a particular viewpoint from the marketplace of ideas. 515 U.S. 819, 831 (1995). In *Rosenberger*, the University of Virginia denied funding to a student magazine that gave a religious editorial perspective on the University's current events. *Id.* at 826-27. Other student publications that took partisan political perspectives on the news did receive funding. Transcript of Oral Argument at 6, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (No. 94-329), 1995 U.S. Trans. LEXIS 70. The University argued that the regulation prohibiting funding to those publications expressing a religious viewpoint was a permissible content-based distinction. *Rosenberger*, 515 U.S. at 830. The Court disagreed, however, reasoning that the "University [did] not exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. Thus, because the University favored one speaker's perspective over another, it committed impermissible viewpoint discrimination. *Id.*

Similarly, *R.A.V. v. City of St. Paul* concluded that a Saint Paul, Minnesota, ordinance that only prohibited fighting words that provoked violence on "the basis of race, color, creed, religion, or gender" was not viewpoint neutral. 505 U.S. 377, 391 (1992). The Court reasoned that although the government may prohibit all fighting words, it cannot prohibit only those fighting words that express a viewpoint on certain subjects, such as race or religion. *Id.* ("The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects."). Such a prohibition would allow proponents of religious tolerance to use fighting words that did not evoke race, color, creed, religion, or gender, while religious bigots could not. *Id.* at 391-92 ("One could hold up a sign saying . . . that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion'."). Thus, by singling out fighting words that provoke violence on the basis of race, color, creed, religion, or gender, the ordinance impermissibly favored one side of the debate on those issues. *Id.* at 392.

---

2. Federal law designates "dignified" burning as the preferred means of disposing of a flag. 36 U.S.C. § 176(k).

2. *The Guidelines are unconstitutional because they are not viewpoint neutral.*

The Court, after review of the relevant authorities, finds that the DMV's Guidelines are not viewpoint neutral. The Guidelines specifically prohibit letter combinations that a reasonable person could view as "[s]ocially, racially, or ethnically offensive or disparaging." *Guidelines*, at 1. Although the DMV could have reasonably prohibited *all* letter combinations that refer to race or ethnicity, it has only prohibited letter combinations that might be viewed as racially or ethnically *offensive or disparaging*. For example, Vermont's vanity-plate program prohibits all references to race and ethnicity. Vt. Code R. 14-050-025(I)(f) (prohibiting combinations "of letters, or numbers that refer, in any language, to a race, religion, color, deity, ethnic heritage, gender, sexual orientation, disability status, or political affiliation"). Thus, plate holders expressing a viewpoint honorific of a particular ethnicity or race may make that expression, but others wishing to express a racially or ethnically disparaging viewpoint may not.

To illustrate, assume that "spud" is a derogatory term for the Irish. According to the Guidelines, a Virginia driver could display an "IRSHPRD" or "LUVIRSH" tag, but not a "DUMSPUD" or "H8IRSH" tag. One can venerate the Irish, but one cannot disparage the Irish. Thus, the Guidelines impose an impermissible viewpoint restriction.

In this case, Petitioner asserts that "Haji" is an honorific term. Conversely, the DMV asserts that the term "Haji" disparages people of Middle-Eastern descent. Regardless of what Petitioner actually intended, the fact is that the DMV revoked his plates because it believed they could be viewed as offensive. Because the Guidelines would allow Petitioner to praise Middle Easterners, but prohibits him from denigrating them, the Guidelines are unconstitutionally viewpoint discriminatory.

D. *Can the "patently offensive" nature of speech justify viewpoint discrimination?*

Relying on *Rose*, Respondents argue that, even if the Guidelines are not viewpoint neutral, the DMV may nonetheless exclude patently offensive letter combinations. In *Rose*, the Fourth Circuit suggested, in dicta, that the DMV could prohibit "patently offensive" speech regardless of whether the prohibition is viewpoint neutral. 361 F.3d at 799. To support this proposition, it cited *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001). *Id.*

1. *The patently offensive nature of speech cannot justify viewpoint discrimination.*

*Perry*, however, did not state that impermissible viewpoint restrictions can be justified by the patently offensive nature of the speech. *Perry* upheld a viewpoint-neutral restriction that prohibited all combinations that referred

to scatological subjects. 280 F.3d at 170 (upholding a restriction prohibiting letter combinations that are "scatological"). The court found that the offensive nature of scatological terms (dealing primarily with fecal excrement) justified the content restriction that prohibited all speech on scatological subjects. *Id.* ("The state has a legitimate interest in not communicating the message that it approves of the public display of offensive scatological terms on state license plates."). The court, however, stated that, while a "state might be permitted to prohibit speech on scatological subjects . . . it may not be able to prohibit the expression of particular views about such subjects. *Id.* Thus, the content restriction was reasonable because it prohibited offensive speech and was viewpoint neutral. *Id.*

In addition, *R.A.V.* held that the proscribable content of speech cannot justify impermissible viewpoint restrictions. 505 U.S. at 391-92. In *R.A.V.*, St. Paul prohibited only those fighting words that provoked violence on "the basis of race, color, creed, religion, or gender." *Id.* The Court asserted that, although the government may prohibit all fighting words, it may not prohibit only those fighting words that express a viewpoint on certain subjects, such as race or religion. *Id.* Thus, the Supreme Court has held that the proscribable content of speech cannot justify viewpoint discrimination. *Id.*

The Court finds that Respondents' contention that impermissible viewpoint restrictions may be justified by the patently offensive nature of speech is insupportable.

## E. *Disposition*

In that the DMV revoked Petitioner's tags in violation of his First and Fourteenth Amendment rights, this matter must be remanded to the DMV. Since the Guidelines' prohibition against letter combinations that are "[s]ocially, racially, or ethnically offensive or derogatory" is not viewpoint neutral, the DMV must, on remand, consider whether a different prohibition justifies revocation. Otherwise, the DMV can simply return the subject plates to Petitioner.

If the DMV chooses to reconsider whether Petitioner's tags may be revoked under a different prohibition, an important question remains. Petitioner argues that, when the DMV revoked his tags, it improperly relied on a bumper sticker that was also attached to his car. Thus, if the DMV wishes to reconsider revocation, this Court must determine whether the DMV may rely on Petitioner's bumper sticker.

**III.** *Did the Guidelines permit the DMV to consider Petitioner's bumper sticker when it revoked his plates?*

Petitioner contends that the DMV exceeded its authority when it considered a bumper sticker that was also displayed on his car to make its determination that his plates should be revoked. The sticker stated: "God Bless Our Troops / Especially Our Snipers," and the DMV used the sticker to give context to Petitioner's plates, asserting that his "ICUHAJI" tags and the sticker, when read together, could be perceived as a threat to Muslims. DMV Informal Conference Decision, at *2 (Apr. 4, 2012). Petitioner contends that the DMV Guidelines did not allow the DMV to consider his "God Bless Our Troops / Especially Our Snipers" bumper sticker when it made its determination.

A. *The Guidelines*

According to the Guidelines, if the DMV receives a complaint about a specific plate, the Office Manager must initiate a review process. If the Office Manager believes there may be grounds to revoke a plate, the Officer Manager must prepare for the matter to be heard by the Personalized Plates Review Committee. *Guidelines,* at 3. The Guidelines prohibit plates that contain "any combination of characters that in any way carries a connotation that may reasonably be seen by a person viewing the license plate as: (1) Profane, obscene, or vulgar in nature; (2) Sexually explicit or graphic; (3) Excretory-related; (4) Used to describe intimate body parts or genitals; (5) Used to describe drugs, drug culture, or drug use; (6) Use to condone or encourage violence; (7) Used to describe illegal activities or illegal substances; and/or (8) Socially, racially, or ethnically offensive or disparaging." *Guidelines,* at 1. Although the Guidelines require the Office Manager to provide the Committee with "any available information that may be relevant to the Committee's deliberations," the Guidelines specifically provide what this information may and must entail. *Guidelines,* at 4.

First, the Office Manager "may" provide the Commission with:

> Any character combination for which the Office Manager would like a recommendation to assist with the decision as to whether the plates should be issued or denied; Any character combination currently on the no issuance list; Acronyms, jargon, and/or interpretations relevant to the characters included in the plate message; Information gathered from reference sources. . . .; Information gleaned from Internet search engines. . . .; Information from internet sites that provide verified information; Translations obtained from foreign language experts; and/or The explanation of the

applicant/plate holder regarding the intended meaning of the plate combination.

*Guidelines, at 4-5. Second, the Office Manager "shall" provide:*

Any currently issued plate combination brought to the attention of DMV as possibly being in violation of the Guidelines; The plate type on which the personalized message will or does appear; The vehicle (make, model, and year) to which the personalized plate will be or is affixed; and Past DMV determinations regarding plate messages which were similar in content and/or interpretation (including determinations by the Office Manager and decisions issued by the Commissioner).

*Guidelines, at 4-5.*

After the Office Manager provides all the necessary information to the Committee, the Committee makes a nonbinding recommendation to the Office Manager on whether the plates should be revoked. *Guidelines*, at 5. The Guidelines specify the standards of review the Committee should apply when reviewing a given license plate:

Requested plate combinations should be reviewed objectively to determine the way the average person, applying contemporary community standards, might view and/or interpret the combination if it were on a license plate where there is no context to explain the meaning, other than the plate type on which the character combination is printed and the vehicle on which the plate is affixed; Applying contemporary community standards means that reviewer should consider the current prevailing accepted meanings or usage of the words or slang, and with due consideration of the fact that license plates are viewed by persons of all ethnic, cultural, age, gender, and employment backgrounds, and persons who are fluent in languages other than English; and The review should be viewpoint neutral. This means that personal or societal biases or prejudices should not be the basis for review.

*Guidelines, at 5-6.*

The Office manager then considers the Committee's recommendation and "all other relevant information," and makes a final determination. *Guidelines*, at 5. Again, however, the Guidelines limit the sources of

relevant information. In making its determination, the Office Manager "may refer to and/or rely on":

> Acronyms, jargon, and/or interpretations relevant to the characters included in the plate message; Past DMV determinations regarding plate messages which were similar in content and/or interpretation. . . .; Reference sources. . . .; Internet search engines. . . .; Internet sites that provide verified information; Foreign language experts; The plate type on which the personalized message will appear; The vehicle (make, model, year) to which the personalized plate will be affixed; The explanation of the applicant/plate holder regarding the intended meaning of the plate combination; and/or The recommendation of the Personalized Plates Review Committee.

*Guidelines, at 2-3.*

In addition, the Guidelines specify that the Office Manager should consider the same standards of review the Committee should consider when making its determination. *Guidelines,* at 5-6. Thus, the Office Manager should make a viewpoint-neutral determination and "interpret the combination if it were on a license plate where there is no context to explain the meaning, other than the plate type on which the character combination is printed and the vehicle to which the plate is affixed." *Guidelines,* at 5-6.

If the plate holder is not satisfied with the Office Manager's final decision, the plate holder may request an administrative appeal to be heard by the DMV Hearing Office according to the VAPA. *Guidelines,* at 3.

After the Office Manager revoked Petitioner's plates, Petitioner requested an informal appeal conference. The DMV conducted an informal appeal conference on February 16, 2012, and Commissioner Holcomb, in a letter dated April 4, 2012, upheld the Officer Manager's determination that the plates should be revoked. In his letter, the Commissioner stated that:

> You asserted that the license plates have solely an "honorific meaning." However, you acknowledged a bumper sticker on your vehicle that states "God Bless Our Troops Especially Our Snipers." Despite your assertion that the bumper sticker has no relation to the license plate, a viewer could reasonably interpret "ICUHAJI" as a threat, particularly when seen adjacent to a bumper sticker referencing snipers.

DMV Informal Conference Decision, at *2 (Apr. 4, 2012). Thus, the Commissioner relied, in part, on Petitioner's bumper sticker when he made his determination.

The question, however, is whether the Guidelines limit what relevant information may be considered by enumerating what sources of information the Office Manager may refer to and/or rely on when makings its determination.

Since the Guidelines enumerate specific sources of information that may be relied on, this enumeration limits what relevant information may be considered. Ordinarily, specific terms in a statute or regulation will override general terms. *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Indeed, "[w]hen general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words." *Cuccinelli v. Rector and Visitors of the Univ. of Va.*, 283 Va. 420, 432, 722 S.E.2d 626, 633 (2012) (citations omitted).

Here, the Guidelines specify that the Office Manger should consider the Committee's recommendation and "all other relevant information" when making its decision. *Guidelines*, at 5. The Guidelines also provide, however, that the Officer Manager "may refer to and/or rely on" specifically enumerated sources of information when making its determination. *Guidelines*, at 2-3. This list is more specific than "all other relevant information," and it accordingly limits where the Office Manager may look for relevant information. Thus, the DMV's consideration is confined to the sources of information enumerated in the Guidelines.

B. *The DMV was not permitted to consider Petitioner's bumper sticker.*

In that the information the Office Manager may consider does not specifically include bumper stickers affixed to the plate holder's car, the Commissioner improperly relied on Petitioner's bumper sticker when he affirmed the Officer Manager's determination. The Guidelines provide that the Office Manger may rely on "[t]he vehicle (make, model, year) to which the personalized plate will be affixed." *Guidelines*, at 2. In addition, the Guidelines provide that the Office Manager should make its determination based on how an average person "might view and/or interpret the combination if it were on a license plate where there is no context to explain the meaning, other than the plate type on which the character combination is printed and the vehicle to which the plate is affixed." *Guidelines*, at 5. The Court finds that this language specifically prohibits the DMV from considering all information about stickers, insignia, or other identifiers on the "vehicle to which the plate is affixed" *other than* the plate type, the character combination, and the vehicle's make, model, and year.

In this case, the Commissioner clearly used the bumper sticker to give context to the plate. This went beyond the plate type, character combination,

and the vehicle's make, model, and year, and therefore, this Court finds that the Commissioner exceeded his authority under the Guidelines.

If the DMV wishes to reconsider revocation, it may not consider the wording of Petitioner's bumper sticker.